# 25-2478-cv

## United States Court of Appeals

*for the*

## Second Circuit

———————◆———————

MICHAEL SALAZAR,
individually and on behalf of all others similarly situated,

*Plaintiff-Appellant,*

– v. –

NATIONAL BASKETBALL ASSOCIATION,

*Defendant-Appellee.*

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK IN NO. 1:22-CV-7935,
HONORABLE JENNIFER LOUISE ROCHON, DISTRICT JUDGE

## BRIEF AND SPECIAL APPENDIX
## FOR PLAINTIFF-APPELLANT

JOSHUA I. HAMMACK
MICHAEL L. MURPHY
BAILEY & GLASSER, LLP
*Attorneys for Plaintiff-Appellant*
1055 Thomas Jefferson Street, NW
Suite 540
Washington, DC 20007
(202) 463-2101

CP COUNSEL PRESS    (800) 4-APPEAL • (387076)

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................. iii

JURISDICTIONAL STATEMENT ..........................................................1

QUESTIONS PRESENTED.....................................................................1

INTRODUCTION ....................................................................................2

STATEMENT OF THE CASE.................................................................4

    Statutory Background ........................................................................5

    The First Appeal ...............................................................................7

    The Operative Second Amended Complaint.....................................8

    The NBA's Motion to Dismiss the Second Amended Complaint ................12

    The District Court's Opinion..........................................................13

SUMMARY OF THE ARGUMENT .....................................................14

STANDARD OF REVIEW ...................................................................15

ARGUMENT .........................................................................................17

    I.    *Solomon* Is Already Bad Law.............................................18

        A.    Three intervening and unanimous Supreme Court opinions forbid the imposition of judge-made atextual tests............................................................................18

        B.    *Solomon* imposes an atextual test on VPPA claims..................22

            1.    The VPPA never mentions an "ordinary person" ..........22

            2.    The Solomon panel conceded the statutory definition of "personally identifiable information" is broad enough to include information only a technologically sophisticated party can understand........................................................26

            3.    The Solomon panel offered no other textual justification for the "ordinary person" test ....................28

i

4. At least four district courts, including one in this circuit, have described the "ordinary person" test as atextual ...................................................................36

C. As Justice Thomas predicted, the "ordinary person" test distorts the VPPA ...............................................................40

D. There is no way to reconcile *Solomon*'s "ordinary person" test with *Ames*, *Antrix*, and *A.J.T.* ..............................44

1. The district court's attempt to reconcile Solomon and the intervening Supreme Court cases falls flat ......................................................................................45

2. Flipps Media's additional argument fails as well...........46

II. When the Statutory Text Is Applied as Written, Mr. Salazar Has a Valid VPPA Claim .................................................................48

A. Facebook is "any person" .........................................................49

B. The NBA knowingly disclosed information that, to *Facebook*, identified Mr. Salazar as having requested or obtained specific video materials or services .......................50

C. The statute requires no more...................................................51

III. If Intervening Supreme Court Precedent Does Itself Not Displace *Solomon*'s "Ordinary Person" Test, that Test Remains Wrong and Should Be Overruled .......................................52

CONCLUSION .....................................................................................................54

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*A.J.T. v. Osseo Area Schools, Independent School District No. 279*,
605 U.S. 335 (2025)................................................................ *passim*

*Ames v. Ohio Department of Youth Services*,
605 U.S. 303 (2025)................................................................ *passim*

*Auburn Hous. Auth. v. Martinez*,
277 F.3d 138 (2d Cir. 2002) ..................................................16

*Banks v. CoStar Realty Info., Inc.*,
No. 4:25-cv-00564, 2025 WL 2959228 (E.D. Mo. Oct. 20, 2025) ......................39

*Bruesewitz v. Wyeth LLC*,
562 U.S. 223 (2011) ............................................................ 34, 35

*CC/Devas (Mauritius) Ltd. v. Antrix Corporation*,
605 U.S. 223 (2025)................................................................ *passim*

*City of Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc.*,
637 F.3d 169 (2d Cir. 2011) ..................................................15

*Eichenberger v. ESPN, Inc.*,
876 F.3d 979 (9th Cir. 2017)................................................ 27, 28

*Fisher v. Aetna Life Ins. Co.*,
32 F.4th 124 (2d Cir. 2022)..................................................15

*Goodman v. Hillsdale Coll.*,
No. 1:25-cv-417, 2025 WL 2941542 (W.D. Mich. Oct. 17, 2025) ......................39

*Hughes v. Nat'l Football League*,
No. 24-2656, 2025 WL 1720295 (2d Cir. June 20, 2025) ............................ 41, 44

*In re Arab Bank, PLC Alien Tort Statute Litig.*,
808 F.3d 144 (2d Cir. 2015)................................................ 16-17

*In re Nickelodeon Consumer Priv. Litig.*,
827 F.3d 262 (3d Cir. 2016)................................................ 27, 37

*In re Zarnel*,
619 F.3d 156 (2d Cir. 2010) ................................................ 16, 46

iii

*Lee v. Springer Nature Am., Inc.*,
769 F. Supp. 3d 234 (S.D.N.Y. 2025) ............................................................. 36, 37

*Lotes Co. v. Hon Hai Precision Ind. Co.*,
753 F.3d 395 (2d Cir. 2014) ..............................................................................16

*Manza v. Pesi, Inc.*,
784 F. Supp. 3d 1110 (W.D. Wis. 2025) ........................................... 29, 37, 38, 39

*Patel v. Garland*,
596 U.S. 328 (2022)..................................................................................... 23, 49

*Salazar v. Nat'l Basketball Ass'n*,
118 F.4th 533 (2024) ................................................................................ *passim*

*Salazar v. National Basketball Association*,
No. 1:22-cv-07935, 2025 WL 2830939 (S.D.N.Y. Oct. 6, 2025)..........................5

*SAS Inst. Inc. v. Iancu*,
584 U.S. 357 (2018)..................................................................................... 23, 49

*Shipping Corp. of India Ltd. v. Jaldhi Overseas Pte Ltd.*,
585 F.3d 58 (2d Cir. 2009) ................................................................................16

*Solomon v. Flipps Media, Inc.*,
136 F.4th 41 (2d Cir. 2025) ...................................................................... *passim*

*Union of Needletrades, Indus. & Textile Emps., AFL-CIO, CLC v. U.S. I.N.S.*,
336 F.3d 200 (2d Cir. 2003) ............................................................. 17, 18, 46, 52

*United States v. Johnson*,
529 U.S. 53 (2000)...................................................................................... 41-42

*United States v. Smith*,
499 U.S. 160 (1991)..........................................................................................42

*Wilson v. Triller, Inc.*,
598 F. Supp. 3d 82 (S.D.N.Y. 2022) ..................................................................30

*Wojchowski v. Daines*,
498 F.3d 99 (2d Cir. 2007) ....................................................................... *passim*

iv

**Statutes & Other Authorities:**

1 U.S.C. § 1 ...............................................................................................47

18 U.S.C. § 798 ..........................................................................................33

18 U.S.C. § 798(a) ......................................................................................33

18 U.S.C. § 2710 ................................................................................... 1, 22

18 U.S.C. § 2710(a)(1) .................................................................................6

18 U.S.C. § 2710(a)(2) ...............................................................................47

18 U.S.C. § 2710(a)(3) ........................................................................ *passim*

18 U.S.C. § 2710(a)(4) ...............................................................................47

18 U.S.C. § 2710(b)(1) ....................................................................... *passim*

18 U.S.C. § 2710(b)(2)(A) ..................................................................... 6, 41

18 U.S.C. § 2710(b)(2)(B) ............................................................... 6, 35, 41

18 U.S.C. § 2710(b)(2)(C) ............................................................... 6, 41, 48

18 U.S.C. § 2710(b)(2)(D) ..................................................................... 6, 41

18 U.S.C. § 2710(b)(2)(E) ............................................................... 6, 41, 47

18 U.S.C. § 2710(b)(2)(F) ............................................................... 6, 41, 48

18 U.S.C. § 2710(c)(2) .................................................................................6

18 U.S.C. § 2710(e) ............................................................................. 29, 30

28 U.S.C. § 1291 ...........................................................................................1

28 U.S.C. § 1331 ...........................................................................................1

134 Cong. Rec. 10259 (May 10, 1988) ....................................................5, 6

S. Rep. No. 100-599 ............................................................................ 5, 6, 33

S. Rep. No. 112-258 ...................................................................................34

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction over Plaintiff Michael Salazar's complaint under 28 U.S.C. § 1331 because his claim arises under federal law—namely, the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710. The district court granted Defendant's motion to dismiss the Second Amended Complaint on October 6, 2025. SPA.1–11.[1] On September 15, 2025, Mr. Salazar timely filed a notice of appeal. JA.10–11. This Court has subject matter jurisdiction to review the lower court's final decision under 28 U.S.C. § 1291.

## QUESTIONS PRESENTED

In the Video Privacy Protection Act, Congress defined the term "personally identifiable information" to include information that "identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3). The statute prohibits a video tape service provider like the NBA from knowingly disclosing such information to "any person." *Id.* § 2710(b)(1). This appeal presents the following questions:

(1)　　Whether courts in this circuit can continue to apply an atextual "ordinary person" standard when assessing whether information

---

[1] Throughout this brief, Plaintiff refers to the Special Appendix—which contains the order under review and the text of the relevant statutory provision—with the citation prefix "SPA." Plaintiff refers to the two volumes of the Joint Appendix—which contain all other relevant materials—with the prefix "JA."

qualifies as "personally identifiable information" under the VPPA, even after intervening Supreme Court opinions have forbidden tests that go beyond a federal statute's text; and

(2) Whether the disclosure of information that identifies an individual as having requested or obtained specific video materials or services to *any person*, even a technologically sophisticated one, counts as a disclosure of "personally identifiable information" under the VPPA.

**INTRODUCTION**

The VPPA prohibits video tape service providers like the NBA from "knowingly disclos[ing]" information that "identifies a person as having requested or obtained specific video materials or services," 18 U.S.C. § 2710(a)(3), to "any person," *id.* § 2710(b)(1). Facebook counts as "any person." No one has ever suggested otherwise. And everyone agrees the NBA disclosed information that—to Facebook, the known, intended, and actual recipient—identified Mr. Salazar as having requested or obtained specific videos. The operative allegations clearly establish that point. And the NBA never argued otherwise. As such, Mr. Salazar's VPPA claim against the NBA should have survived a motion to dismiss.

And yet the district court dismissed it. The court did so based solely on the "ordinary person" test this Court adopted in May 2025. Under that test, information that allows an "ordinary person to identify a consumer's video-watching habits"

2

counts as "personally identifiable information." *Solomon v. Flipps Media, Inc.*, 136 F.4th 41, 52 (2d Cir. 2025). But information "only a sophisticated technology company"—like Facebook—understands to do so does *not* count as "personally identifiable information," even if the relevant disclosure went to a sophisticated technology company that did, in fact, understand it. *Id.*

About six weeks after this Court decided *Solomon*, the Supreme Court unanimously decided *Ames v. Ohio Department of Youth Services*, 605 U.S. 303 (2025); *CC/Devas (Mauritius) Ltd. v. Antrix Corporation*, 605 U.S. 223 (2025); and *A.J.T. v. Osseo Area Schools, Independent School District No. 279*, 605 U.S. 335 (2025). In each case, the Supreme Court flatly prohibited the application of an atextual test—one that goes beyond what a federal statute's text requires. And, in each case, the Supreme Court insisted that courts apply federal statutes as written.

*Solomon*'s "ordinary person" test is atextual. Indeed, that conclusion should hardly be controversial. The VPPA never once mentions an "ordinary person." It never distinguishes between "ordinary" and "sophisticated" recipients of disclosures. Instead, it prohibits disclosures to "any person," 18 U.S.C. § 2710(b)(1), of whatever kind, without distinction or limitation. In addition, as this Court admitted when it adopted the "ordinary person" test, the VPPA's definition of "personally identifiable information" can "be read to encompass computer code and digital identifiers decipherable only by a technologically sophisticated third party."

3

*Solomon*, 136 F.4th at 52. The *Solomon* panel excluded that permissible reading only by imposing a limitation that goes beyond the VPPA's text. Not surprisingly, then, multiple courts have accurately described *Solomon*'s test as atextual. Given intervening Supreme Court precedent, *Solomon* is no longer good law.

Without the atextual weight of the "ordinary person" test, Mr. Salazar has alleged a valid VPPA claim. As noted above, he alleged that the NBA knowingly disclosed information that—to Facebook, the known, intended, and actual recipient of the disclosures at issue—identified him as having requested or obtained specific video materials or services. The VPPA's text requires no more. And, as *Ames*, *Antrix*, and *A.J.T.* make clear, this Court is not free to demand more either. The Court should reverse the order granting the NBA's motion to dismiss and vacate the judgment.[2]

## STATEMENT OF THE CASE

In this lawsuit, Michael Salazar alleges that the NBA violated the VPPA by disclosing his and others' personally identifiable information to Facebook without first obtaining consent. JA.308–51. The NBA filed a motion to dismiss the complaint, arguing—based solely on *Solomon*'s "ordinary person" test—that Mr. Salazar failed to plead that the NBA had disclosed his "personally identifiable information." JA.354–84. The Honorable Jennifer L. Rochon, United States District

---

[2] This appeal presents the same issues as those presented in *Golden v. NBCUniversal Media, LLC*, No. 25-2226. As a result, Mr. Salazar's arguments here substantially overlap with Ms. Golden's arguments there.

4

Judge for the Southern District of New York, granted the NBA's motion with prejudice, holding—again based solely on *Solomon*'s "ordinary person" test—that the disclosures at issue here did not include "personally identifiable information." SPA.1–11. The opinion can be found at *Salazar v. National Basketball Association*, No. 1:22-cv-07935, 2025 WL 2830939 (S.D.N.Y. Oct. 6, 2025). This appeal ensued.

### Statutory Background

After Ronald Reagan nominated Judge Bork to the Supreme Court, a journalist asked Judge Bork's local video store which movies he had rented. *Salazar v. Nat'l Basketball Ass'n*, 118 F.4th 533, 544 (2024). The store handed over a list of 146 films. *Id.* The journalist published "The Bork Tapes." *Id.* Congress "quickly decried the publication." *Id.*; *see also* 134 Cong. Rec. 10259 (May 10, 1988).

Congress was concerned "the computer age," which had already "revolutionized our world," gave businesses the ability "to be more intrusive than ever before." S. Rep. No. 100-599, at 6; *see also id.* at 5–6 (worrying "Big Brother" would use the "vast amounts of personal information" in computerized records to engage in broad surveillance); *id.* at 7 (describing it as "a new, more subtle and pervasive form of surveillance"); *id.* at 7–8 (crediting testimony that "advanced information technology" fostered "more intrusive data collection" and "increased demands for personal information," including by businesses hoping "to better

5

advertise their products"); 134 Cong. Rec. at 10259–60 (describing a "form of surveillance" "[n]ot even George Orwell anticipated").

But Congress's central concern was that Americans were losing control over their private information in an increasingly technological world. S. Rep. No. 100-599, at 6–7. It believed unauthorized disclosures of video-watching histories offer "a window into our loves, our likes, and dislikes." *Id.* at 7; *see also* 134 Cong. Rec. at 10259 (explaining that what we watch reflects who we are as people). It believed watching videos is an "intimate process" that "should be protected from the disruptive intrusion of a roving eye." S. Rep. No. 100-599, at 7.

Accordingly, Congress enacted the VPPA, which generally prohibits a "video tape service provider" from "knowingly disclos[ing], to any person, personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710(b)(1). The law permits such disclosures in six narrow circumstances, including with the consumer's "informed, written consent." *Id.* § 2710(b)(2)(A)–(F). Any unauthorized disclosure, however, subjects a provider to liquidated damages of $2,500, punitive damages, attorneys' fees, and equitable relief. *Id.* § 2710(c)(2).

The VPPA also defines several key terms. For example, "consumer" means "any renter, purchaser, or subscriber of goods or services from a video tape service provider." *Id.* § 2710(a)(1). And "personally identifiable information" includes

6

information that "identifies a person as having requested or obtained specific video materials or services from a video tape service provider." *Id.* § 2710(a)(3).

**The First Appeal**

Mr. Salazar filed his first complaint against the NBA in September 2022. SPA.3. In August 2023, the district court granted the NBA's motion to dismiss Mr. Salazar's complaint with prejudice because he alleged he subscribed only to the NBA's online newsletter, and not to some audiovisual good or service. JA.47–68. As relevant to that first dismissal, the district court held that one could be a "consumer under the VPPA" only if he "rents, purchases, or subscribes to[] audio visual materials, not just any products or services from a video tape service[] provider." JA.63. The court held that, while the newsletters might "entice or encourage recipients to view" the NBA's videos, "there [was] no assertion that a newsletter subscription was required to access those videos, functioned as a login, or gave newsletter subscribers extra benefits as viewers." JA.64.

Mr. Salazar appealed. On October 15, 2024, this Court decided that appeal. *See Salazar v. Nat'l Basketball Ass'n*, 118 F.4th 533 (2d Cir. 2024). There, this Court confirmed that, while the VPPA may use "terms that invoke a bygone era of video technology," it "is no dinosaur statute." *Id.* at 536, 553. Indeed, although "modern means of consuming [video] content may be different, . . . the VPPA's privacy protections remain as robust today as they were in 1988." *Id.* at 553.

7

As relevant to that earlier dismissal, this Court reviewed the VPPA's text, structure, and purpose to conclude that the statutory term "'consumer' should be understood to encompass a renter, purchaser, or subscriber of *any* of the [video tape service] provider's 'goods or services'—audiovisual or not." *Id.* at 549. In other words, "goods or services" in the VPPA's definition of "consumer" is *not* limited to audio-visual materials. *Id.* at 546–49. This Court also refused to "[g]raft[] unstated limitations on the broad definition of 'consumer,' and by extension, 'goods or services,'" because doing so was "inconsistent with Congress's purpose." *Id.* at 549.

### The Operative Second Amended Complaint

Back at the district court, Mr. Salazar filed a First Amended Complaint. SPA.3. Shortly thereafter, this Court decided *Solomon v. Flipps Media, Inc.*, 136 F.4th 41 (2d Cir. 2025). There, a panel of this Court held the phrase "'personally identifiable information' encompasses information that would allow an ordinary person to identify a consumer's video-watching habits, but not information that only a sophisticated technology company could use to do so." *Id.* at 52. It also held that, to decide whether a disclosure contained "personally identifiable information," a court must assess whether an ordinary person could use it to identify an individual's "video-watching habits" "with little or no extra effort." *Id.* at 54.

In response, Mr. Salazar filed the operative Second Amended Complaint. JA.308–51. There, he alleged the NBA violated the VPPA by knowingly disclosing

8

his "personally identifiable information" to Facebook without his consent. JA.309. To start, he alleged that the NBA delivers, and is in the business of delivering, "countless hours of video content to its digital subscribers." JA.313; *see also* JA.348 (alleging these video offerings are "similar to prerecorded video cassette tapes").

Mr. Salazar also alleged he had—and continues to have—a "digital subscription to NBA.com." JA.312; *see also* JA.344. To obtain it, he was required to provide, among other things, his e-mail address and IP address (*i.e.*, a unique number assigned to devices that reveals the user's "city, zip code and physical location"). JA.317; *see also* JA.344. And he alleged the NBA intentionally installed the Facebook Pixel on its website NBA.com. JA.310, JA.349. This surveillance software tracks when users enter a website and what they do there, including which videos they watch. JA.310, JA.315–16, JA.331–32, JA.334–45.

Mr. Salazar then alleged he "accessed video content via his subscription to [the NBA's] newsletter." JA.344; *see also* JA.345 (alleging Mr. Salazar "requested, obtained, and/or watched prerecorded audio visual material on [w]ww.nba.com and through his digital subscription"). As a result, the NBA disclosed his Facebook ID and which videos he watched to Facebook. JA.310, JA.345. A Facebook ID is "a unique and persistent identifier that Facebook assigns to each user." JA.337. Because it links to "only one account," a Facebook ID more precisely identifies a particular individual than that person's first and last name. JA.339.

9

At all relevant times, the NBA "knew that these disclosures identified [Mr. Salazar] . . . to Facebook" and "also knew" they included his video-watching histories. JA.350; *see also* JA.315 (alleging that, "[b]y transmitting Facebook-specific identifiers (i.e., Facebook IDs) and video file names" through the Facebook Pixel—a tool Facebook itself created—the NBA "expressly instructed Facebook as to the exact videos and other content the consumer accessed"); JA.337 (alleging the NBA "knew and understood what the Pixel was, how it functioned, and what data it would collect and share with [Facebook] because [the NBA] installed the Pixel on its site and configured its functionality"); JA.339 (alleging the disclosure of a Facebook ID to Facebook "enables direct linkage of an individual to particular content [he] ha[s] viewed"); JA.341 ("At all relevant times, [the NBA] knew that the Facebook pixel disclosed Personal Viewing Information to Facebook."); JA.343 (alleging the NBA used Facebook's tools to "transmit" Facebook IDs and "video content identifiers directly to Facebook").

Indeed, the NBA "chose, programmed, and intended for Facebook to receive" this exact information. JA.350; *see also* JA.335–36 (alleging the NBA identified which website events to track and disclosed information about which videos users watched because it benefitted financially from the disclosures); JA.349 (alleging the NBA "affirmatively programmed the Pixel into the code for nba.com"). And the NBA made these disclosures even though Mr. Salazar had "never consented, agreed,

10

authorized, or otherwise permitted" the NBA to do so. JA.345; *see also* JA.309–10, JA.318, JA.343, JA.349 (alleging the NBA never informed Mr. Salazar of these disclosures, let alone obtained his written consent for them).

And Facebook did, in fact, receive and understand these disclosures. JA.311 (alleging the disclosures allowed Facebook "to know what Video Media one of its users viewed on NBA.com"); JA.316 (alleging Facebook "leveraged" the disclosed information "to build detailed profiles for targeted advertising based on a consumer's video-watching habits"); JA. 333–34 (alleging the Pixel's "ability to associate a user's interactions on websites across the internet with that specific user's unique Facebook profile" is "[c]rucial to [its] effectiveness"); JA.334 (alleging Facebook "was able to instantaneously associate" Mr. Salazar's identifying information to the videos he had watched); JA.340 (alleging "Facebook can easily identify any individual on its Facebook platform with only [his] unique F[acebook] ID"); JA.341 (alleging Facebook understands the "event data" transmitted by the Pixel); JA.343 (alleging Facebook can "make a direct connection" between Facebook IDs, specific Facebook users, and the videos they have watched and that the disclosures revealed an individual's "identity and the specific video materials [he] requested from Defendant's website"); JA.345 (alleging Facebook was in a "special position" because it knew how to use Facebook IDs to "directly identify" particular users, like Mr. Salazar, and "could also access his entire historical Facebook dataset").

11

Facebook and the NBA then used this disclosed information to create targeted advertising, for which each "received financial remuneration." JA.316, JA.341. In this way, the NBA "monetized" its consumers by disclosing their "Personal Viewing Information to Facebook." JA.341.

**The NBA's Motion to Dismiss the Second Amended Complaint**

In response to the Second Amended Complaint, the NBA filed another motion to dismiss, this time based primarily on Mr. Salazar's inability to satisfy *Solomon*'s "ordinary person" standard. JA.354–83. The NBA argued *Solomon* forecloses Mr. Salazar's VPPA claim because he did not allege an "ordinary person" would understand the disclosures at issue. JA.360–61, JA.370–74.

Critically, though, the NBA admitted that it delivers "audiovisual content to consumers" on its website and *also* transmits "information about [those] consumers' video viewing history . . . to Facebook via the Pixel." JA.360. The NBA insisted these disclosures actually "benefit[] consumers." *Id.* More importantly, it argued this "transmission of computer code"—which it agreed contained Mr. Salazar's Facebook ID and "the title of the viewed video"—did not amount to personally identifiable information under the VPPA because only a sophisticated technology company (*i.e.*, Facebook) could use it to "identify a site visitor's video-watching habits." JA.361. An "ordinary person" could not. *Id.*

12

In response, Mr. Salazar argued *Solomon*'s atextual "ordinary person" test could not survive the three intervening and unanimous Supreme Court decisions discussed above. JA.410–46. In reply, the NBA argued those three unanimous decisions "hav[e] nothing to do with the VPPA." JA.452. Instead, according to the NBA, those three Supreme Court cases stand "only for the uncontroversial principle that courts interpret statutes according to their plain text." *Id.*; *see also* JA.454–55 (similar). The NBA did not explain which portion of the VPPA's "plain text"—which nowhere mentions an "ordinary person"—compels the "ordinary person" test.

## The District Court's Opinion

On October 6, 2025, the district court granted the NBA's motion to dismiss with prejudice. SPA.1–11. The court applied *Solomon*'s reasoning and held that Mr. Salazar's claim—like Ms. Solomon's and Mr. Hughes's—failed because a hypothetical "ordinary person" who did not receive the disclosures at issue here would not have understood them the way Facebook did understand them. SPA.6–11.

The district court held the recent trio of unanimous Supreme Court decisions did not "undermine" *Solomon* such "that it will inevitably be overturned." SPA.7 (internal quotation marks and citation omitted). It explained that each case "dealt with unrelated and distinct statutes," not the VPPA. SPA.8. It emphasized that the three cases "do not call into question the Second Circuit's interpretation of 'personally identifiable information' in the VPPA." *Id.* (citation omitted). And it held

13

that, in each of those cases, the Supreme Court "rejected the lower courts' tests because they were inconsistent with the text of the statute." *Id.* But it did not believe *Solomon*'s "ordinary person" test "runs afoul of the statutory text of the VPPA." *Id.*

Because Mr. Salazar's allegations "mirror those found insufficient in *Solomon* and *Hughes*," the district court dismissed his VPPA claim with prejudice. SPA.9–11. Put simply, "an ordinary person would not plausibly be able to identify [Mr. Salazar's] video-watching habits as a result of the Pixel transmissions." SPA.11.

On November 7, 2025, Mr. Salazar timely filed a notice of appeal. JA.11.

## SUMMARY OF THE ARGUMENT

The district court's only reason for dismissing Mr. Salazar's VPPA claim was this Court's decision in *Solomon*. But *Solomon*'s "ordinary person" standard is atextual. The VPPA never references an "ordinary person." Nor does it draw any distinction between "ordinary" and "sophisticated" recipients of information that "identifies a person as having requested or obtained specific video materials or services." 18 U.S.C. § 2710(a)(3). Instead, the statute prohibits knowing disclosures of such information to "any person," *id.* § 2710(b)(1), of whatever kind, without distinction or limitation. *Solomon*'s "ordinary person" test imposes an additional requirement that goes beyond the statutory text—namely, that the disclosed information be understandable not just to the actual recipient, but also to a

14

hypothetical non-recipient. This "ordinary person" test distorts the VPPA. Indeed, as this case amply demonstrates, the test permits what the VPPA's text prohibits.

Mere weeks after *Solomon* adopted the atextual "ordinary person" test, the Supreme Court handed down *Ames*, *Antrix*, and *A.J.T.* In each opinion, the Supreme Court unanimously held that courts cannot apply atextual tests when evaluating claims brought under federal statutes. Given this intervening precedent, *Solomon* is no longer good law. And the "ordinary person" test must fall to the wayside.

As the Supreme Court has now made clear, courts must evaluate Mr. Salazar's VPPA claim based only on what the statute's text requires. Here, the NBA knowingly disclosed information that identified Mr. Salazar and the videos he requested or obtained *to Facebook*. Because the statute requires no more, Mr. Salazar has alleged a valid VPPA claim. This Court should reverse the order granting the NBA's motion to dismiss and vacate the corresponding judgment.

## STANDARD OF REVIEW

This Court reviews a grant of a motion to dismiss *de novo*. *See, e.g.*, *City of Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 173 (2d Cir. 2011). In doing so, this Court "accept[s] all factual allegations in the complaint as true" and "draw[s] all reasonable inferences in the plaintiff's favor." *Id.* Likewise, the district court's legal conclusions, including its interpretations of a statute, are "reviewed *de novo*." *Id.*; *see also Fisher v. Aetna Life Ins. Co.*, 32 F.4th 124, 135 (2d Cir. 2022)

15

(holding that, "[f]or issues concerning statutory interpretation, . . . the standard of review is also de novo"); *Auburn Hous. Auth. v. Martinez*, 277 F.3d 138, 143 (2d Cir. 2002) ("Questions of statutory interpretation are reviewed *de novo*.").

In addition, although a panel of this Court is generally bound by an earlier panel's published decision, where—as here—at least one intervening Supreme Court decision "casts doubt" on this Court's otherwise controlling precedent, "one panel of this Court may overrule a prior decision of another panel." *In re Zarnel*, 619 F.3d 156, 168 (2d Cir. 2010) (citation omitted); *see also Lotes Co. v. Hon Hai Precision Ind. Co.*, 753 F.3d 395, 405–06 (2d Cir. 2014) (holding existing circuit precedent was "no longer good law" because an intervening Supreme Court decision "thoroughly undermine[d]" its reasoning); *Wojchowski v. Daines*, 498 F.3d 99, 108–09 (2d Cir. 2007) (holding existing circuit precedent was "no longer good law" given an intervening Supreme Court case's "subtle," but "fundamental," effect).[3]

"The intervening decision need not address the precise issue decided by the panel for this exception to apply." *In re Zarnel*, 619 F.3d at 168 (citation omitted); *see also In re Arab Bank, PLC Alien Tort Statute Litig.*, 808 F.3d 144, 155 (2d Cir.

---

[3] In *In re Zarnel*, a panel of this Court concluded prior circuit precedent was no longer good law after circulating the opinion to all active judges and receiving no objection—a process known as "mini-*en banc*" proceedings. 619 F.3d at 168 n.5; *see also Shipping Corp. of India Ltd. v. Jaldhi Overseas Pte Ltd.*, 585 F.3d 58, 67 & n.9 (2d Cir. 2009) (concluding a "relatively recent case" was no longer good law after doing the same). Mr. Salazar notes the availability of this procedure here. And, of course, he does not object to its use in this case.

16

2015), *as amended* (Dec. 17, 2015) (noting that reexamination of existing circuit precedent is appropriate whenever there is "a conflict, incompatibility, or inconsistency between [that] precedent and the intervening Supreme Court decision"); *Wojchowski*, 498 F.3d at 106 (likewise noting the Supreme Court decision need not have addressed the exact issue resolved by an earlier panel); *Union of Needletrades, Indus. & Textile Emps., AFL-CIO, CLC v. U.S. I.N.S.* ("*UNITE*"), 336 F.3d 200, 210 (2d Cir. 2003) (same).

Instead, where intervening Supreme Court precedent even "subtly disturb[s]" existing circuit precedent, this Court is "*required* to address the question . . . of the extent to which [the intervening Supreme Court case] disturbs controlling law in [this] Circuit." *Wojchowski*, 498 F.3d at 108–09 (emphasis added). Where an intervening Supreme Court decision "is inconsistent with" existing circuit precedent, then, this Court "*must* revisit the question." *Id.* at 109 (emphasis added). And this required reexamination must be undertaken whenever an intervening opinion from the Supreme Court contains reasoning "sufficiently broad" to conclude that this Court's earlier approach was wrong. *UNITE*, 336 F.3d at 210.

## ARGUMENT

The district court dismissed Mr. Salazar's VPPA claim based solely on *Solomon*'s atextual "ordinary person" test. But intervening Supreme Court precedent forbids courts from imposing atextual tests when evaluating claims brought under

17

federal statutes. Because there is no way to reconcile a case applying an atextual test and intervening Supreme Court opinions forbidding the application of atextual tests, *Solomon* is no longer good law. When the statute is applied as written, as it must be, Mr. Salazar has a valid VPPA claim. This Court should reverse.

## I. *Solomon* **Is Already Bad Law.**

A panel of this Court decided *Solomon* on May 1, 2025. Just over a month later, the Supreme Court decided *Ames v. Ohio Department of Youth Services*, 605 U.S. 303 (2025); *CC/Devas (Mauritius) Ltd. v. Antrix Corporation*, 605 U.S. 223 (2025); and *A.J.T. v. Osseo Area Schools, Independent School District No. 279*, 605 U.S. 335 (2025). Those three cases flatly prohibit the imposition of a test that goes beyond a federal statute's text. But the *Solomon* panel, without the benefit of intervening precedent, did exactly that. It imposed an atextual "ordinary person" test on the phrase "personally identifiable information" in the VPPA. As Justice Thomas predicted, that atextual test has distorted the underlying statute and resulted in the dismissal of valid VPPA claims. *Solomon* cannot be reconciled with the Supreme Court's intervening decisions and is no longer good law. Its atextual "ordinary person" standard must "give way." *UNITE*, 336 F.3d at 210 (citation omitted).

### A. Three intervening and unanimous Supreme Court opinions forbid the imposition of judge-made atextual tests.

Near the end of its most recent completed Term, the Supreme Court made clear—in repeated and unanimous opinions—that judges are not permitted to impose

18

atextual tests on claims arising under federal statutes. Instead, courts must apply federal statutes as written, without embellishment. In other words, courts must demand of litigants only what is required by the statutory text. And, if the statutory text does *not* require a particular element or showing, courts cannot do so either.

Start with *Ames*. There, the Court confronted the "background circumstances" test five circuits imposed on majority-group plaintiffs bringing Title VII discrimination suits. *Ames*, 605 U.S. at 307–08 & n.1. The unanimous Court flatly rejected this atextual standard because "Title VII's disparate-treatment provision draws no distinctions between majority-group plaintiffs and minority-group plaintiffs." *Id.* at 309. Instead, it prohibits discrimination against "any individual." *Id.* (citation omitted). And "any" means "every." *Id.* at 309–10. Thus, the "background circumstances" test could not "be squared with the text of Title VII." *Id.* at 309. "Congress left no room" for courts to impose additional requirements. *Id.*; *see also id.* at 313 (vacating because the lower courts granted the defendant judgment based on a rule "that *Title VII* does not impose" (emphasis added)).

Justice Thomas—joined by Justice Gorsuch—wrote separately "to highlight the problems that arise when judges create atextual legal rules and frameworks." *Id.* at 313 (Thomas, J., concurring). He explained these "[j]udge-made doctrines have a tendency to distort the underlying statutory text, impose unnecessary burdens on litigants, and cause confusion for courts." *Id.*; *see also id.* at 326 (explaining they

19

tend to "generate complexity, confusion, and erroneous results"). He also noted judge-made standards provide "no principled way to resolve doctrinal ambiguities" precisely because courts have no "underlying legal authority on which to ground their analysis" (*e.g.*, statutory text). *Id.* at 315.

The same day the Supreme Court decided *Ames*, it also delivered *Antrix*. There, it confronted the Ninth Circuit's imposition of *International Shoe*'s familiar "minimum contacts" standard on the Foreign Sovereign Immunities Act's personal-jurisdiction provision. *Antrix*, 605 U.S. at 226, 231. Again, the Court unanimously reversed because that "additional requirement goes beyond the text of the FSIA." *Id.* at 226 (noting the statute imposes only two requirements, but "the Ninth Circuit imposed a third"). "Notably absent" from the statute was "any reference to 'minimum contacts.'" *Id.* at 233. Put simply, "Congress did not require 'minimum contacts' over and above the contacts already required by the Act's enumerated exceptions to foreign sovereign immunity." *Id.* at 232. Indeed, "nothing in the [statutory] text . . . *requires* a minimum-contacts analysis." *Id.* at 233 (emphasis added). And the Court "decline[d] to add in what Congress left out." *Id.*; *see also id.* at 234 (criticizing the Ninth Circuit for "read[ing] an additional requirement" into the statute "[i]nstead of enforcing [its] provisions as written").

Finally, about a week later, the Supreme Court decided *A.J.T.* There, it confronted yet another judge-made, atextual test—the "bad faith or gross

20

misjudgment" standard some circuits applied to claims concerning "educational services" under the Americans with Disabilities Act. *A.J.T.*, 605 U.S. at 338–39, 344 & n.3. Once again, the Court rejected that "judicial gloss" unanimously. *Id.* at 343–45. It did so because there was "no textual indication" the judge-made test should apply. *Id.* at 345. Indeed, "[n]othing in the [statutory] text . . . suggests" claims concerning educational services "should be subject to a distinct, more demanding analysis." *Id.* Instead, the law's text protected "any" person alleging discrimination. *Id.* And the Court confirmed, once again, that this language is "expansive and unqualified," meaning the law's protections extend to "*every* such person, without distinction or limitation." *Id.* (internal quotation marks and citation omitted).

These three unanimous cases, all decided after *Solomon*, make clear that atextual rules are verboten. And, contrary to the NBA's argument below, these three cases did not merely announce general principles of statutory construction like "the uncontroversial principle that courts interpret statutes according to their plain text." JA.452. To start, it is hard to imagine why a bedrock principle like that one would have caused the Supreme Court to grant certiorari three separate times in a single Term, as opposed to GVRing cases to apply existing binding precedent. Nor is it

21

clear why, in a single Term, that well-established rule would have engendered three published opinions and an explanatory concurrence.

In *Ames*, *Antrix*, and *A.J.T.*, the Supreme Court was indeed announcing something new—namely, that atextual tests (*i.e.*, those that require or prohibit something beyond what appears in the federal statute's text) are out of bounds. And the three cases make clear, for the first time, that judges simply are not free to impose a requirement unless it arises from a statute's text.

### B. *Solomon* imposes an atextual test on VPPA claims.

*Solomon*'s "ordinary person" standard is not required by the VPPA's text. Not even the *Solomon* panel suggested otherwise. Indeed, the "ordinary person" test is, at best, wholly atextual. And there are multiple ways to arrive at this conclusion. At worst, the "ordinary person" test contradicts the VPPA's plain text. Whether atextual or counter-textual, *Solomon*'s "ordinary person" test cannot stand.

### *1. The VPPA never mentions an "ordinary person."*

The first and most obvious indication that *Solomon*'s "ordinary person" standard is atextual is the fact that the VPPA nowhere includes the words "ordinary person." *See generally* 18 U.S.C. § 2710. The statute does not use the phrase in the definition of "personally identifiable information." *Id.* § 2710(a)(3). Nor does the phrase appear in the VPPA's one-sentence liability clause. *Id.* § 2710(b)(1). The statute never once mentions the phrase "ordinary person," at all, anywhere.

To borrow the Supreme Court's language, "[n]otably absent" from the entire VPPA is "any reference" to an ordinary person. *Antrix*, 605 U.S. at 233. Certainly nothing in the VPPA's text *requires* an examination of what an "ordinary person" might understand. *See id.* (assessing whether the text "*requires* a minimum-contacts analysis" (emphasis added)).

Instead, the VPPA prohibits a "video tape service provider" from "knowingly disclos[ing], to *any person*, personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710(b)(1) (emphasis added). Although the *Solomon* panel never analyzed the phrase "any person" from Section 2710(b)(1), "any" person means "every" person, "without distinction or limitation." *A.J.T.*, 605 U.S. at 345; *see also Ames*, 605 U.S. at 309–10 (confirming "any" means "every"); *Patel v. Garland*, 596 U.S. 328, 338 (2022) (holding "any" has "an expansive meaning," such that "any judgment" includes judgments "of whatever kind"); *SAS Inst. Inc. v. Iancu*, 584 U.S. 357, 359 (2018) ("In this context, as in so many others, 'any' means 'every.'"); *Salazar*, 118 F.4th at 546 (holding an "expansive word[] like 'any' . . . bespeaks breadth" (citation omitted)). Thus, the VPPA's text prohibits disclosures to ordinary persons and to technologically sophisticated persons and to "every" person "of whatever kind," "without distinction or limitation."

As to Section 2710(a)(3)'s definition of "personally identifiable information," then, *Solomon*'s "ordinary person" standard is atextual. The *Solomon* panel inserted

23

a test without any textual support in the definition itself. Given the Supreme Court's unanimous holdings in *Ames*, *Antrix*, and *A.J.T.*, this judicial invention alone would suffice to overrule *Solomon*. The "ordinary person" test is, after all, an "additional requirement" that "goes beyond the [statutory] text." *Antrix*, 605 U.S. at 226.

But the "ordinary person" test looks even worse when considered alongside Section 2710(b)(1)'s "any person" language. 18 U.S.C. § 2710(b)(1). By its express terms, the VPPA prohibits disclosures of "personally identifiable information" to "any person," *id.*, not to "any ordinary person," and not to "any person in a way an ordinary person might understand." Nor does Section 2710(b)(1)—or any other provision of the VPPA, for that matter—draw any distinction between ordinary and technologically sophisticated recipients of disclosed information. *See Ames*, 605 U.S. at 309 (relying on the fact that the statutory text "draws no distinctions" between the groups on either side of an atextual test). As such, "Congress left no room" for courts to impose an "ordinary person" standard here. *Id.* at 310; *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 101 (2012) (noting that "the presumed point of using general words"—including, specifically, "any person"—"is to produce general coverage," and "*not* to leave room for courts to recognize ad hoc exceptions" (emphasis added)).

Despite this "any person" language, the *Solomon* panel adopted and applied the "ordinary person" test, which necessarily draws a distinction between "ordinary"

24

recipients and technologically "sophisticated" ones. *See Solomon*, 136 F.4th at 52 (redefining "personally identifiable information" to include only information an "ordinary person" could understand as connecting an individual to her video-watching history and, more importantly, to exclude information only a "sophisticated technology company" could understand to do so). The VPPA's text simply does not impose this limitation. *See Ames*, 605 U.S. at 313.[4]

When contrasted with Section 2710(b)(1), then, *Solomon*'s "ordinary person" test does not merely insert a test where none existed. It judicially amends a broadly worded prohibition of disclosures to every person, of whatever kind, without distinction or limitation, into an allowance for any and all disclosures to particularly sophisticated or knowledgeable persons. *Solomon*'s "ordinary person" test is not just *a*textual; it is *counter*-textual. Either way, like the tests in *Ames*, *Antrix*, and *A.J.T.*, *Solomon*'s "ordinary person" test cannot "be squared with the [statutory] text." *Ames*, 605 U.S. at 309. That fact alone compels this Court to abandon it.

---

[4] It bears mentioning that the "ordinary person" is itself a judicial construct. An "ordinary person" is a fictitious and hypothetical person, not a real one. Section 2710(b)(1), meanwhile, prohibits disclosures to "any person," which—as the Supreme Court has repeatedly explained—includes all persons actually in existence. It is unclear whether or how the statute might prohibit disclosures to hypothetical persons that do not exist, and have never existed, in the real world. It is less clear still how or why the statute would prohibit disclosures to persons that actually exist based solely on the presumed understanding of persons that do not exist.

*2. The* Solomon *panel conceded the statutory definition of "personally identifiable information" is broad enough to include information only a technologically sophisticated party can understand.*

To begin its analysis, the *Solomon* panel openly acknowledged the text of Section 2710(a)(3)'s definition of "personally identifiable information" can "be read to encompass computer code and digital identifiers decipherable only by a technologically sophisticated third party." *Solomon*, 136 F.4th at 52. This concession confirms the "ordinary person" standard imposes a requirement that goes beyond the VPPA's text. Nothing in the statute's text requires, as a condition of liability, the disclosures to be in plain English. Nor does anything in the statute's text require a court to examine whether the disclosure is decipherable by any non-recipient, whether that non-recipient happens to be an ordinary person, a technologically sophisticated one, or anything in between.

The panel's separate statement that Section 2710(a)(3)'s definition could also "be read to refer to the kind of information that would readily permit an ordinary person to identify a specific individual's video-watching behavior," *id.* (internal quotation marks and citation omitted), does not advance the ball. The panel identified no particular language in the definition that could be read to refer, narrowly and exclusively, to information an "ordinary person" can understand. The reason is simple: None exists. The statutory definition certainly *includes* that kind of readily decipherable information. But, as the panel admitted, the statutory text does

26

not itself exclude information that can be understood "only by a technologically sophisticated third party." *Id.* Section 2710(a)(3)'s text draws no distinction whatsoever between those information sets.

The architect of the "ordinary person" test made a similar admission. *See In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 285 (3d Cir. 2016). In *Nickelodeon*, the Third Circuit, like the *Solomon* panel here, openly admitted the statutory "text itself is . . . amenable" to an interpretation that would include "static digital identifiers"—like IP addresses and browser fingerprints—as "personally identifiable information." *Id.* at 285–86. And it went one step further, agreeing the VPPA's legislative history could be read to support that interpretation as well. *See id.* at 285. Still, the Third Circuit fashioned the "ordinary person" test. *See id.* at 284. And it did so, after concluding the statutory definition was "not entirely clear" or "straightforward," *id.* at 282, 284, based solely its view of "Congress's purpose," which it divined from "legislative history," *id.* at 284. The Third Circuit did not even pretend the VPPA's text itself asked what an "ordinary person" might understand.[5]

Both the *Solomon* panel and the Third Circuit admitted the obvious—the VPPA's definition of "personally identifiable information" is broad enough to

---

[5] For its part, the Ninth Circuit adopted the "ordinary person" test because it believed that test "better informs video tape service providers of their obligations under the VPPA," *not* because it believed the VPPA's text required it. *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 985 (9th Cir. 2017).

include *both* information only a technologically sophisticated entity understands *and* information an ordinary person understands. This reality confirms the statutory text "draws no distinctions" among recipients, meaning courts are not free to fashion and impose their own. *Ames*, 605 U.S. at 309. The *Solomon* panel's "[f]irst" justification for the "ordinary person" test, then, is no justification at all.

> 3. *The* Solomon *panel offered no other textual justification for the "ordinary person" test.*

The *Solomon* panel's "[s]econd" justification fares no better. There, the panel pointed to the presence of "knowingly" in Section 2710(b)(1), observing that "the statute views disclosure from the perspective of the disclosing party" and that liability does not hinge on "what the recipient of that information decides to do with it." *Solomon*, 136 F.4th at 52 (citing *Eichenberger*, 876 F.3d at 985). The panel also noted it would "not make sense" for a provider's liability" to "turn on circumstances outside of its control" or on the recipient's "level of sophistication." *Id.*

But the panel confusingly used these facts to justify an "ordinary person" standard that (1) does not view the disclosure from the disclosing party's perspective and, instead, views it from the perspective of a hypothetical "ordinary person" who neither disclosed nor received the information, (2) hinges on what this "ordinary person" could do with the disclosed information, (3) necessarily depends on circumstances outside the provider's control (*i.e.*, what a hypothetical "ordinary person" understands), and (4) turns entirely on the sophistication of a third party,

albeit a hypothetical "ordinary" one instead of the one that actually received the disclosure. *See, e.g.*, *Manza v. Pesi, Inc.*, 784 F. Supp. 3d 1110, 1121 (W.D. Wis. 2025) (noting the "ordinary person" standard "*does* turn on circumstances outside the video tape service provider's control" and "does not provide clear guidance to a video tape service provider because it rests on what a hypothetical third party may do with the information it received, and it requires the video tape service provider to speculate on the abilities of an 'ordinary person'").

More fundamentally, though, the liability clause's inclusion of the word "knowingly" does not require examination of what an "ordinary person" understands. Instead, it requires examination of what *the video tape service provider itself* understands. On this score as well, the "ordinary person" test injects a requirement that goes beyond the VPPA's text. *See, e.g.*, *id.* at 1119 (noting the "ordinary person" test improperly "focuses on the recipient" instead of "what the video tape service provider knows" and further explaining the intent element "does not inform the meaning of PII" because it "places a limitation on when" a provider "can be held liable for disclosing PII; the element does not explain what PII *is*").

And there is further textual support for the conclusion that the scope of "personally identifiable information" hinges only on what the video tape service provider itself knows, not on what some third party—whether the actual recipient, a hypothetical "ordinary person," or anyone else—might know. In Section 2710(e),

29

the VPPA affirmatively requires video tape service providers to "destroy personally identifiable information as soon as practicable." 18 U.S.C. § 2710(e). Here, a video tape service provider must identify, *for itself*, and in the absence of any disclosure, information in its possession that "identifies a person as having requested or obtained specific video materials or services." *Id.* § 2710(a)(3).

If a video tape service provider locates information that so identifies a person *to the video tape service provider itself*, it is statutorily obligated to destroy that information. *See id.* § 2710(e); *Wilson v. Triller, Inc.*, 598 F. Supp. 3d 82, 91–92 (S.D.N.Y. 2022) (noting "the VPPA sets out requirements regarding the handling of PII that do not implicate the disclosure of information to a recipient," such that the scope of "personally identifiable information" should not be "recipient-dependent" at all). And there is no reason to believe that "personally identifiable information"— a single, statutorily defined term—might mean something different in Section 2710(e) than it does in Section 2710(b)(1).

Given this requirement, a video tape service provider's obligations are clear without the "ordinary person" test. If the provider itself understands information to "identif[y] a person as having requested or obtained specific video materials or services," 18 U.S.C. § 2710(a)(3), it cannot knowingly disclose that information to "any person," *id.* § 2710(b)(1), and it must destroy that information "as soon as practicable," *id.* § 2710(e). There was never a need, nor any textual basis, to consider

30

what an "ordinary person" might think of the information a video tape service provider itself understands to identify a person's video-watching history.

Moreover, all sorts of "knowing" disclosures between communicating parties would *not* be understood by an "ordinary person" uninvolved in that communication. Consider baseball. In a typical game, from Little League all the way to the Majors, a third base coach might use his right hand to touch the brim of his hat, his belt buckle, his right knee, his left elbow, his left wrist, his chin, his nose, his ear, and then his hat for a second time. The coach understands this sequence of signals—or some part of it—to communicate a "bunt" instruction to the batter. He knows the batter will understand the signals the same way because they have worked on the signals together all season. And, in fact, the batter understands the signal and puts down a bunt. Surely everyone examining this scenario would conclude the third base coach knowingly disclosed the "bunt" instruction to the batter. That conclusion remains true even though members of the opposing team, the umpire, fans in the stands, viewers at home, and all manner of other people—ordinary and extraordinary—did not understand the signals to communicate any message at all.

This reality, of course, is not unique to baseball. In fact, demonstrative examples abound. Near the end of her weekly variety shows, Carol Burnett tugged her ear as a secret "I love you" to her grandmother. Before shooting his free throws, Utah Jazz legend Jeff Hornacek rubbed the side of his face to say "hi" to his kids.

31

Peyton Manning famously shouted "Omaha" to alert the Broncos' offense that, because the play clock was running low, he was changing the snap count. The College of Cardinals tells Catholics—and other onlookers—there is a new pope by burning chemicals that release white smoke from the Sistine Chapel. During a televised interview in 1966, future Senator Jeremiah Denton—then a prisoner of war—said he received adequate food, clothing, and medical care. But he repeatedly blinked T-O-R-T-U-R-E in Morse Code, confident U.S. intelligence officers, who had taught him Morse Code, would understand. Throughout much of World War II, Nazis used the Enigma Machine to communicate coded top-secret messages, while Americans used Navajo code talkers for the same purpose.

In each example, both the disclosing party and the recipient understood an idiosyncratic code or signal to communicate a particular message. In each case, the sender "knowingly" disclosed that message to the recipient. That some hypothetical "ordinary person" might not have understood—and, without additional information, likely could not have understood—an ear tug, a face rub, "Omaha," a particular color of smoke from a particular Vatican chimney, blink patterns, Morse Code, nonsensical strings of text, or a language he had never learned to communicate those same messages makes no difference at all. The disclosures to the intended and actual recipients—whom the disclosing parties *knew* would understand the coded messages and who did, in fact, understand them—remain "knowing."

32

A contrary conclusion would not just eviscerate the VPPA. It could also have devastating national security implications. For example, federal law punishes anyone who "knowingly" discloses "classified information" to "an unauthorized person" with fines and imprisonment. 18 U.S.C. § 798(a). If the word "knowingly" somehow imports the "ordinary person" test into a statute, it must do so there too. On that reading, those with classified information are free to disclose it—with impunity—to neighbors, lifelong friends, passing acquaintances, known spies, hostile foreign governments, and all manner of other unauthorized persons, so long as they do so in ways an "ordinary person" will not understand. To state the proposition is largely to defeat it. It is no wonder courts applying 18 U.S.C. § 798 have *never* imposed the "ordinary person" test. No one would credit the atextual argument in that context. No one should credit it here, either.

The *Solomon* panel's final justification misses the mark as well. There, it pointed to the fact that the Internet had not yet "transformed the way that individuals and companies use consumer data" in 1988. *Solomon*, 136 F.4th at 53. Perhaps so, but Congress was clearly worried—even then—about the way "the computer age" had "revolutionized our world." S. Rep. No. 100-599, at 6. It was concerned that computerized records gave businesses the ability "to be more intrusive than ever before," as "advanced information technology" continued to foster both "more intrusive data collection" and "increased demands for personal information." *Id.* at

33

5–8. And it passed a broadly worded privacy statute to cover continuously advancing technology. Given its animating concerns, it is hard to believe Congress would have adopted a law that, despite a broadly worded prohibition, silently permits all manner of disclosures as long as they are understood only by technologically sophisticated companies—the very entities about which Congress was *most* concerned.

As a final point, analyzing the fact that Congress did not amend the VPPA's definition of "personally identifiable information" in 2013, *Solomon*, 136 F.4th at 53, is out of bounds. "Post-enactment legislative history (a contradiction in terms) is not a legitimate tool of statutory interpretation." *Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 242 (2011). Courts should not consider it at all. *See id.* The Congress that voted to enact the VPPA, for example, could not possibly have been informed by what some later Congress considered, wrote, or decided to do. *See id.* And, even if it were a permissible consideration, it is unclear what post-enactment legislative history could tell us here. As far as Mr. Salazar is aware, no court had applied the "ordinary person" test to "personally identifiable information" until the Third Circuit did so in 2016—three years *after* Congress decided not to amend the definition.

Moreover, recall the impetus for Congress's limited amendment to the VPPA. In 2012, Congress expressly recognized that "the VHS cassette tape" was largely "obsolete." S. Rep. 112-258, at 2. By then, the Internet had already "revolutionized the way that American consumers rent and watch movies and television programs."

34

*Id.* Then, as now, "so-called 'on-demand' cable services and Internet streaming services allow[ed] consumers to watch movies or TV shows on televisions, laptop computers, and cell phones." *Id.* Congress noted that "[t]he Internet has similarly revolutionized how Americans share information." *Id.* Such information could now readily be shared "on social networking sites, like Facebook and Twitter." *Id.*

Congress clarified that, under the VPPA as originally enacted, a video tape service provider needed to obtain the consumer's consent "each time the provider wishe[d] to disclose" personally identifiable information. *Id.* at 2–3. To reduce the "obstacles" posed by that constraint, Congress "amend[ed] the VPPA to allow consumers to provide their informed, written consent to disclose video viewing information—if they wish—one time in advance." *Id.* at 3 (explaining that this consent may permit disclosures "on an ongoing basis for a period of up to two years at a time"); *see also* 18 U.S.C. § 2710(b)(2)(B) (specifically allowing providers to obtain consumers' written consent via "electronic means using the Internet").

Put simply, Congress amended the VPPA specifically to account for the Internet's revolutionary impacts. It did so while acknowledging the existence of streaming services and the new ways Americans, including American companies, might share personally identifiable information. In this context, with these express concerns, there is no reason to believe Congress declined to revise the definition of "personally identifiable information" because it failed to appreciate the Internet's

35

impact. Instead, there is every reason to believe it declined to do so precisely because it believed the existing definition already covered Internet-based activities.

> 4. *At least four district courts, including one in this circuit, have described the "ordinary person" test as atextual.*

About two months before the *Solomon* panel adopted the "ordinary person" test, a district court in the Southern District of New York confronted the argument. It held that whether information counts as "PII cannot turn on whether [the disclosed information] would readily permit an ordinary person to identify a specific individual's video-watching behavior." *Lee v. Springer Nature Am., Inc.*, 769 F. Supp. 3d 234, 260 (S.D.N.Y. 2025) (internal quotation marks and citation omitted). The court explained the "ordinary person" test does not arise from the VPPA's text. Instead, it "is a judicial construct." *Id.* And—although the court could not have known it at the time—the imposition of a "judicial construct" not required by a federal statute's text is exactly what *Ames*, *Antrix*, and *A.J.T.* forbid.

Still, that court carefully considered the arguments in favor of the "ordinary person" test and offered additional reasons to reject it:

> When used with respect to the recipient, [the "ordinary person" test] creates an objective measure to determine how information will be understood based on Congress's objectives in passing a statute. In consumer-protection law, for example, courts have evaluated communications from the perspective of an unsophisticated recipient based on the view that the Fair Debt Collections Practice Act is intended to protect all consumers, the gullible as well as the shrewd. The ordinary consumer is the recipient of the information, and the intent of the statute is to protect him from the provider. The situation with the VPPA is the

36

exact opposite—the ordinary person [*i.e.*, the "consumer"] is the *provider* of the information, and the purpose of the statute is to protect him from the *recipient* [*i.e.*, the "video tape service provider"].

The catalyst for the VPPA was an article written after the reporter obtained the titles of video tapes that Judge Bork had rented. The reporter was neither the "ordinary person" nor was he the "average person." The VPPA is not addressed to measuring the effect that a communication or a disclosure would have on the average recipient.

Congress intended to protect renters of video materials from the savvy reporter as well as from the average person. The statutory text makes that clear: an ordinary person would not necessarily have the time, motivation or skill to link a physical address to a person, but physical addresses are protected because they are closely linked to individual identity. Digital identifiers cannot be excluded from the definition of PII simply because a hypothetical "ordinary person" does not understand how to use them.

*Id.* at 260–61 (internal quotation marks, citations, and alteration omitted; paragraph breaks inserted). In any event, that court confirmed what both the *Nickelodeon* court and the *Solomon* panel admitted—namely, the "ordinary person" test is not required by the VPPA's text. *See id.* at 260.

At least three out-of-circuit district courts have examined the "ordinary person" test since *Solomon* was decided and reached the same conclusion. The *Manza* court struck first. There, a district court in the Western District of Wisconsin reiterated that "[t]he VPPA itself does not place a specific limit on the type of person who can identify a customer's video purchases." *Manza*, 784 F. Supp. 3d at 1118. It noted that courts applying the "ordinary person" test do not "rely on the text" of the statute. *Id.* at 1119 (noting separately that "courts that have adopted the 'ordinary

37

person' standard have identified little textual basis for the limitation they impose"); *see also id.* at 1123 (agreeing the "ordinary person" test "is a judicial construct" that "is not supported by the VPPA's text").

Indeed, the *Manza* court explained that, "[u]nder the plain language of the statute, it does not matter who is doing the identifying or how they are doing it, so long as the video tape service provider *knows* that the information can be used by a third party to identify a specific person." *Id.* at 1118. As such, "information that uniquely identifies a customer to a third party can qualify as PII, regardless of whether the third party is an 'ordinary person' or a social media company." *Id.*

By charting a different course, the "ordinary person" test "creates a substantial loophole in the VPPA's coverage and allows easy evasion." *Id.* at 1122. Because of that test, "a video tape service provider is free to disclose a customer's video purchases to social media companies, data brokers, or anyone else, even when the provider knows that the third party will be able to easily identify the customer, so long as the provider uses a 'code' that an 'ordinary person' could not decipher." *Id.* "Applying this logic to the Judge Bork case would mean that the video store would be free to disclose Judge Bork's rental history so long as the store matched that history with an ID number provided by the reporter instead of with the judge's name." *Id.* Put simply, it "makes no sense" to "allow[] video tape service providers

38

and third parties to knowingly evade the statute by disclosing a customer's identity with a number unknown to the 'ordinary person' but known by the recipient." *Id.*[6]

In mid-October, a district court in the Western District of Michigan echoed *Manza*'s analysis. *See Goodman v. Hillsdale Coll.*, No. 1:25-cv-417, 2025 WL 2941542, at *8 (W.D. Mich. Oct. 17, 2025) (agreeing "with the persuasive reasoning of the district court in *Manza*"). It, too, noted that courts applying the "ordinary person" standard "have identified little textual basis" for doing so. *See id.*

Days later, a district court in the Eastern District of Missouri similarly described the "ordinary person" test as "extra-textual." *Banks v. CoStar Realty Info., Inc.*, No. 4:25-cv-00564, 2025 WL 2959228, at *6 (E.D. Mo. Oct. 20, 2025).

Put simply, in the short time *Solomon* has existed as binding law in this circuit, there has been a growing chorus of courts declaring its "ordinary person" atextual. Because *Ames*, *Antrix*, and *A.J.T.* forbid the imposition of atextual tests, *Solomon* is no longer good law. Based on intervening Supreme Court precedent, this Court

---

[6] The *Solomon* panel explored this example at oral argument. *See* Oral Arg. at 11:40–19:00, *Solomon v. Flipps Media, Inc.*, No. 23-7597 (2d Cir.). There, a panel member posed a hypothetical where Netflix and a reporter jointly developed numerical identifiers for fifty judicial nominees. *See id.* Netflix then disclosed to the reporter a spreadsheet with two columns—one with the numbers both sides understood to identify particular nominees and a second with each nominee's video-watching history. *See id.* And defense counsel agreed, albeit reluctantly, that this disclosure would violate the VPPA. *See id.* And yet *Solomon* nonetheless permits even that rudimentarily coded disclosure because a hypothetical "ordinary person," operating without the key Netflix and the reporter created and kept to themselves, would not understand the spreadsheet to identify the nominees' video-watching histories.

should abandon the "ordinary person" test. And, instead of applying that test here, this Court should faithfully apply the VPPA's text as written.

### C. As Justice Thomas predicted, the "ordinary person" test distorts the VPPA.

Perhaps not surprisingly, *Solomon*'s atextual "ordinary person" test distorts the VPPA's operation. The most glaring example is, as discussed above, the way the test twists Section 2710(b)(1)'s "any person" language. *See supra* at 22–25. The VPPA's text prohibits disclosures of information that "identifies a person as having requested or obtained specific video materials or services," 18 U.S.C. § 2710(a)(3), to "any person," *id.* § 2710(b)(1). But the "ordinary person" test hollows out the statute. It *allows* disclosures of that exact information, to anyone and everyone, so long as the disclosures are made in a way a hypothetical "ordinary person" (who did not receive them) would not understand. It is difficult to imagine a larger statutory distortion. The "ordinary person" test allows the very thing the VPPA's text prohibits.

Consider the impact on this very case. Mr. Salazar alleged the NBA *knew* Facebook would understand the disclosures to identify his video-watching history. JA.315, JA.335–36, JA.337, JA.339, JA.341, JA.343, JA.349, JA.350. He alleged that Facebook did understand the disclosures to link Mr. Salazar to the specific video materials he had requested or obtained. JA.311, JA.316, JA. 333–34, JA.340, JA.341, JA.343, JA.345. The NBA agreed with these points. JA.360–61. Because of *Solomon*'s atextual test, however, the district court dismissed Mr. Salazar's claim.

40

*See* SPA.6–11. And it did so because a hypothetical "ordinary person" who did not receive those disclosures would not have understood them the way Facebook did, in fact, understand them. *See id.* The distortion could hardly be clearer.

But there are at least two more notable distortions. *First*, as this Court noted shortly after *Solomon*, the "ordinary person" test embodies a new, unenacted statutory exception: "*Solomon* effectively shut the door for Pixel-based VPPA claims." *Hughes v. Nat'l Football League*, No. 24-2656, 2025 WL 1720295, at *2 (2d Cir. June 20, 2025) (summary order). But Congress did not place the Pixel—or any other technology—beyond the VPPA's reach. Indeed, the statute never mentions *how* the prohibited disclosures might occur at all.

Instead, Congress enacted six specific and narrow exceptions to the VPPA's broad prohibition of all unauthorized disclosures of personally identifiable information. *See* 18 U.S.C. § 2710(b)(2)(A)–(F). These exceptions are not illustrative; they are exhaustive. And none applies here. *Solomon*'s creation of an unenacted seventh exception to the VPPA's coverage—either for disclosures made via the Pixel or, more broadly, for all those disclosures an "ordinary person" would not understand—conflicts with the ancient maxim "expressio unius est exclusion alterius" (*i.e.*, the expression of one thing excludes all others).

In other words, when Congress enacted six specific exceptions, it "left no room," *Ames*, 605 U.S. at 309, for courts to impose still more. *See, e.g., United States*

41

*v. Johnson*, 529 U.S. 53, 58 (2000) ("When Congress provides exceptions in a statute, it does not follow that courts have authority to create others. The proper inference, and the one we adopt here, is that Congress considered the issue of exceptions and, in the end, limited the statute to the ones set forth."); *United States v. Smith*, 499 U.S. 160, 167 (1991) ("Congress' express creation of these two exceptions convinces us that the Ninth Circuit erred in inferring a third[.]"). The judicially created exception for Pixel-based disclosures, or—more broadly—for those not understood by an "ordinary person," predictably distorts the VPPA.

*Second*, the *Solomon* panel did not hold that every disclosure the hypothetical "ordinary person" would understand to link an individual to his video-watching history contains "personally identifiable information." Instead, it imposed a second atextual limitation. According to *Solomon*, a disclosure contains "personally identifiable information" only if the hypothetical "ordinary person" would understand it to identify the individual's video-watching habits "with little or no extra effort." *Solomon*, 136 F.4th at 54. But "extra" compared to what? There is no identified baseline. It is unclear how a hypothetical person might exert *any* effort, let alone "extra" effort. And, in any event, how much "extra" effort is too much?

Consider some examples. A video tape service provider writes an individual's name and the videos he watched in invisible ink that can be seen only when the page reaches 300°F. The recipient must turn on an oven and ensure the paper reaches

42

300°F (without going too far over, or else the paper will combust). Is that too much "extra" effort? What if the provider writes the information, again in invisible ink, in Pig Latin, so the recipient must first apply heat and then translate whatever appears into plain English? Is that too much "extra" effort? What if it is Latin instead of Pig Latin? Suppose, instead, that the provider uses technology that reveals the information in plain English, but only after the recipient has run a 5K. Is that too much "extra" effort? What if the recipient must complete the 5K in under thirty minutes? Twenty-five minutes? What if it is a 10K? A marathon?

Or suppose the recipient must simply walk to the mailbox at the end of the driveway to retrieve the disclosure. Is that too much "extra" effort? What if there is a winter weather event, so the recipient cannot get to the mailbox without shoveling first? Or what if the disclosure happens online, but only after the recipient successfully completes a CAPTCHA test? What if it is a series of ten increasingly difficult CAPTCHA tests? Fifty? One hundred? What if the recipient must upload a photo of his license to access the online disclosure? What if he must solve a riddle?

Suppose the recipient must drink Ovaltine for weeks, send off for a secret decoder pin, wait to receive it in the mail, and then—upon receiving it—listen to a radio program and decode a disclosure quickly conveyed via a series of numbers, translatable only via the decoder pin, to understand a plain English message? *See, e.g.*, A CHRISTMAS STORY (MGM 1983). Is *that* too much "extra" effort? Or suppose

43

a recipient must drive—during rush hour—across Washington, D.C., locate a regional video store, have a face-to-face conversation with the manager about a specific judge's video-watching records, wait half an hour to receive 146 movie titles, and then drive back home. Is that too much "extra" effort?

These questions are not academic. This Court has suggested, for example, that merely plugging information into ChatGPT is too much "extra" effort. *See Hughes*, 2025 WL 1720295, at *3. If that level of effort is too much, it seems any disclosure that is even one simple step removed from an ordinary person's immediate understanding escapes the VPPA's broadly stated prohibition. But the larger problem is that courts applying *Solomon* have "no principled way to resolve doctrinal ambiguities" precisely because there is no "underlying legal authority on which to ground their analysis." *Ames*, 605 U.S. at 315 (Thomas, J., concurring). The "ordinary person" test is itself a judicial invention. The same is true of the "with little or no extra effort" add-on. Each aspect introduces unresolvable doctrinal ambiguities about issues the statute never even mentions. The distortion here is obvious.

### D. There is no way to reconcile *Solomon*'s "ordinary person" test with *Ames*, *Antrix*, and *A.J.T.*

*Solomon* imposed an atextual "ordinary person" test on claims brought under the VPPA. Weeks later, the Supreme Court unanimously prohibited the practice of imposing atextual tests on federal statutory claims. In fact, it did so three times over.

44

The effect of the Supreme Court's intervening precedent's is not exactly "subtle." *Wojchowski*, 498 F.3d at 108–09. But it is certainly "fundamental." *Id.*

This Court has not addressed *Solomon*'s vitality in light of the intervening Supreme Court precedent. But *Solomon*'s imposition of an atextual standard cannot be reconciled with intervening precedent forbidding atextual tests.

> 1. *The district court's attempt to reconcile* Solomon *and the intervening Supreme Court cases falls flat.*

Mr. Salazar is aware of only one court that has attempted to justify *Solomon*'s "ordinary person" test after *Ames*, *Antrix*, and *A.J.T.* And it was the district court here. SPA.8. The court offered two reasons for continuing to apply *Solomon*'s atextual "ordinary person" standard.

*First*, it noted that *Ames*, *Antrix*, and *A.J.T.* "dealt with unrelated and distinct statutes," not with the VPPA. *Id.* But judges are not permitted to engraft atextual standards onto any federal statutes. There is no reason to think judge-made atextual tests are off limits for Title VII, the Foreign Sovereign Immunities Act, and the Americans with Disabilities Act, but are somehow permissible for the VPPA. Nor would it make sense to require the Supreme Court to grant certiorari concerning every federal statute, one by one, only to repeat, over and over again, that courts are not allowed to impose an atextual test on each individual statute. *See* GROUNDHOG DAY (Columbia Pictures 1993). And the district court's reasoning would require intervening decisions to "address the precise issue" decided by the earlier panel,

45

apparently in the context of the same statute. *In re Zarnel*, 619 F.3d at 168. This is not the law. *See, e.g.*, *id.*; *Wojchowski*, 498 F.3d at 106; *UNITE*, 336 F.3d at 210.

*Second*, the court believed *Solomon*'s "ordinary person" standard does not "run[] afoul of the statutory text of the VPPA." *Id.* But, to start, this holding seems to get the analysis backwards. The question is whether the statutory text requires resort to the "ordinary person" test. No court has ever suggested it does. And multiple courts—including this one in *Solomon*—have admitted it does not. *See supra* Parts I.B.2 & I.B.4. In any event, as discussed above, the "ordinary person" test is fundamentally inconsistent with the VPPA's text. *See supra* at 22–25 & Part I.C. Indeed, as discussed above, it allows what the statute's text prohibits. *See id.*

### 2. Flipps Media's additional argument fails as well.

Although—so far as Mr. Salazar is aware—no court has ever adopted this reasoning, Flipps Media offered a third justification for the "ordinary person" test in response to a petition for certiorari. *See* Brief in Opposition at 30–31, *Solomon v. Flipps Media, Inc.*, No.25-228 (S. Ct. Oct. 27, 2025). There, it argued that "any person" in Section 2710(b)(1) means only "a *natural person*." *Id.* at 30; *see also id.* at 31 (claiming the VPPA draws a distinction "between a 'person' and an 'entity'"). For at least four reasons, this explanation cannot justify the "ordinary person" test.

*First*, long before it enacted the VPPA, Congress instructed that, "[i]n determining the meaning of any Act of Congress, unless the context indicates

otherwise[,] . . . the word[] 'person' . . . include[s] corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals." 1 U.S.C. § 1. This instruction is consistent with an "age-old" understanding of "person," which—in legal use—traditionally includes "not only natural persons (human beings) but also artificial persons such as corporations, partnerships, associations, and both public and private organizations." Scalia & Garner, *Reading Law* 273; *see also id.* at 101–06.

*Second*, the VPPA's context does not suggest a narrower meaning for "any person" here. Indeed, the VPPA plainly uses the phrase "any person" to refer to businesses, not just to natural persons. *See* 18 U.S.C. § 2710(a)(4) (defining "video tape service provider" as "*any person* engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials" (emphasis added)); *id.* § 2710(b)(2)(e) (allowing disclosures "incident to the ordinary course of business of the video tape service provider"—which includes, among other things, "transfer[s] of ownership," *id.* § 2710(a)(2)). The notion that, from its inception, the VPPA defined "video tape service provider" to exclude businesses like Blockbuster and Potomac Video—where Judge Bork rented movies—strains credulity.

*Third*, the VPPA's enumerated exceptions make clear that "any person" in Section 2710(b)(1) includes artificial persons. For example, the VPPA allows

disclosures to "a law enforcement agency pursuant to a warrant . . . , a grand jury subpoena, or a court order." 18 U.S.C. § 2710(b)(2)(C). A "law enforcement agency" is not a natural person. If Section 2710(b)(1) prohibited disclosures only to natural persons, there would be no need for this "law enforcement agency" exception. In addition, there is a statutory exception for disclosures "pursuant to a court order, in a civil proceeding," without any limitation to natural persons. *Id.* § 2710(b)(2)(F). This exception, too, allows for disclosures to businesses, which would be unnecessary if "any person" in Section 2710(b)(1) meant only natural persons.

*Fourth*, even if—counterfactually—the VPPA prohibited disclosures only to natural persons, there remains no indication that this natural person must be an "ordinary person." Many natural persons are technologically sophisticated. Even if the VPPA prohibits disclosures only to natural persons, then—and it decidedly does not—the statute still "draws no distinctions," *Ames*, 605 U.S. at 309, between "ordinary" and "sophisticated" natural persons. Accordingly, even indulging the counterfactual provides no basis for *Solomon*'s "ordinary person" test.

## II. When the Statutory Text Is Applied as Written, Mr. Salazar Has a Valid VPPA Claim.

The NBA's argument hinged on *Solomon*'s atextual "ordinary person" test, which is no longer good law. By the statute's plain text, Mr. Salazar has a valid claim.

48

### A. Facebook is "any person."

The VPPA does not ask whether Facebook, the recipient of the NBA's disclosures here, is an "ordinary person." Instead, the statute prohibits knowing disclosures of "personally identifiable information" to "any person." 18 U.S.C. § 2710(b)(1). Thus, the only statutorily relevant question is whether Facebook is "any person." And it is. Indeed, as before, "any" person means "every" person, "without distinction or limitation." *A.J.T.*, 605 U.S. at 345; *see also Ames*, 605 U.S. at 309–10 (confirming "any" means "every"); *Patel*, 596 U.S. at 338 (holding "any" means "of whatever kind"); *SAS Inst.*, 584 U.S. at 359 (similar).

The NBA did not even argue that Facebook is not "any person." Nor did the district court hold as much. And, as discussed above, there is no basis to conclude that "any person," as used in Section 2710(b)(1), refers only to natural persons. *See supra* Part I.D.2. Indeed, given the VPPA's exceptions, "any person" clearly includes artificial persons. *See id.* Nor is there any basis to conclude that the VPPA's "any person" language refers only to some other subset of persons. Instead, the VPPA's broad liability clause prohibits knowing disclosures to "every" person, "of whatever kind," "without distinction or limitation."

As such, "any person" includes businesses. It includes sophisticated technology companies. Facebook fits comfortably within the VPPA's "any person" language. *See* Scalia & Garner, *Reading Law* 101 (noting that the "point of using

49

general words"—like "any person"—is "to produce general coverage" and further noting that "general words . . . must be given general effect").

### B. The NBA knowingly disclosed information that, *to Facebook*, identified Mr. Salazar as having requested or obtained specific video materials or services.

There can be no doubt that the NBA knowingly disclosed to Facebook—that is, "any person"—information that identified Mr. Salazar "as having requested or obtained specific video materials or services." 18 U.S.C. § 2710(a)(3). To start, the operative allegations—which, at this stage, must be accepted as true—make this point crystal clear. *See, e.g.*, JA.350 (alleging the NBA "knew that these disclosures identified [Mr. Salazar] . . . to Facebook" and "also knew" they included his video-watching histories); JA.315 (alleging that, "[b]y transmitting Facebook-specific identifiers (i.e., Facebook IDs) and video file names" through the Facebook Pixel—a tool Facebook itself created—the NBA "expressly instructed Facebook as to the exact videos and other content the consumer accessed"); JA.337 (alleging the NBA "knew and understood what the Pixel was, how it functioned, and what data it would collect and share with [Facebook] because [the NBA] installed the Pixel on its site and configured its functionality"); JA.341 ("At all relevant times, [the NBA] knew that the Facebook pixel disclosed Personal Viewing Information to Facebook.").

There is likewise no doubt Facebook understood these disclosures to identify Mr. Salazar and his video-watching history. On this point as well, the operative

50

allegations leave no doubt. *See, e.g.*, JA.311 (alleging the disclosures allowed Facebook "to know what Video Media one of its users viewed on NBA.com"); JA.316 (alleging Facebook "leveraged" the disclosures "to build detailed profiles for targeted advertising based on a consumer's video-watching habits"); JA.334 (alleging Facebook "was able to instantaneously associate" Mr. Salazar's identifying information to the videos he had watched); JA.341 (alleging Facebook understands the "event data" transmitted by the Pixel); JA.343 (alleging Facebook can "make a direct connection" between Facebook IDs, specific individual Facebook users, and the videos they have watched and that the disclosures revealed an individual's "identity and the specific video materials [he] requested from Defendant's website").

There is no basis for this Court to conclude otherwise. And no one ever argued, let alone held, that the NBA expected anything less.

### C. The statute requires no more.

Whether a hypothetical non-recipient might have *also* understood the disclosures that Facebook understood is statutorily irrelevant. The VPPA never asks what a non-recipient might have thought. It does not ask what a hypothetical "ordinary person" might have understood. Nor does it ask how hard that hypothetical person might have to work to understand what the actual recipient—here, Facebook—actually did understand. And yet the *only* basis for dismissal here was

51

*Solomon*'s misguided focus on whether an "ordinary person" who did not receive the disclosures at issue would have understood them.

The VPPA provides no basis to ask this question. And there is no statutory reason to care about the answer. Per the statute's plain text, it is enough that the NBA disclosed information that identified Mr. Salazar as having requested or obtained specific video materials or services *to Facebook* (*i.e.*, one "person"). No other "person"—ordinary or extraordinary, highly sophisticated or technologically illiterate, particularly hard-working or indolent—matters at all.

### III. If Intervening Supreme Court Precedent Does Itself Not Displace *Solomon*'s "Ordinary Person" Test, that Test Remains Wrong and Should Be Overruled.

If this Court disagrees that *Ames*, *Antrix*, and *A.J.T.* require *Solomon* to "give way," *UNITE*, 336 F.3d at 210 (citation omitted), Mr. Salazar wishes to preserve fully his argument that *Solomon* is wrong. If the Court believes *Solomon* remains good law despite those intervening Supreme Court decisions, it may—and should— reconsider en banc whether the "ordinary person" test should be applied here. And the Supreme Court may consider that question as well.

The "ordinary person" test is wrong for the same reasons discussed above. *See supra* Parts I & II. In particular, (1) the VPPA's text makes no mention of an "ordinary person" and prohibits disclosures to "any person," of whatever kind, without distinction or limitation, *see supra* Part I.B; (2) the test fundamentally

52

distorts the statute, *see supra* at 22–25 & Part I.C, and (3) application of the test conflicts with Supreme Court precedent in numerous ways, *see supra* Parts I.C & I.D. At the most basic level, the "ordinary person" test allows what the VPPA plainly prohibits. *See supra* at 22–25 & Parts I.B, I.C, II.

In addition, *Solomon* overlooks perhaps the most basic rule of human communication: Know your audience. It replaces a known and intended audience (*i.e.*, Facebook) with an unknown (and possibly unknowable) "ordinary person" who was never intended to receive the disclosed information—and who, in fact, did not receive it. And it ignores what the disclosing party knows about the disclosed information and about what the intended recipient understands.

Therefore, if this Court concludes that intervening Supreme Court precedent does not itself require the Court to abandon *Solomon*, it should reconsider the issue en banc. And it should make good on its promise that the VPPA "is no dinosaur statute," *Salazar*, 118 F.4th at 553, by confirming what the VPPA's plain text establishes: An unauthorized disclosure of information that "identifies a person as having requested or obtained specific video materials or services," 18 U.S.C. § 2710(a)(3), is off limits—even when it utilizes modern technology, and even when it is understood only by the technologically sophisticated company that received it. This Court should denounce the "ordinary person" test, which "[g]raft[s] unstated

53

limitations on the broad definition" of personally identifiable information and is "inconsistent with Congress's purpose." *Salazar*, 118 F.4th at 549.

## CONCLUSION

For the foregoing reasons, the order granting the NBA's motion to dismiss should be reversed, and the corresponding judgment should be vacated.

Dated: December 19, 2025

*/s/ Joshua I. Hammack*

JOSHUA I. HAMMACK
MICHAEL L. MURPHY
BAILEY & GLASSER, LLP
*Attorneys for Plaintiff-Appellant*
1055 Thomas Jefferson Street, NW
Suite 540
Washington, DC 20007
(202) 463-2101

54

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B), the word limit of Local Rule 32.1(a)(4)(A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f): this document contains 12,984 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because: this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font Times New Roman.

Dated: December 19, 2025

# SPECIAL APPENDIX

i

## TABLE OF CONTENTS

|                                                                                          | Page |
|------------------------------------------------------------------------------------------|------|
| Decision and Order of the Honorable Jennifer L. Rochon, dated October 6, 2025, Appealed From ....................................................... | SPA-1 |
| 18 U.S. Code § 2710 – Wrongful Disclosure of Video Tape Rental or Sale Records ........................ | SPA-12 |

SPA-1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MICHAEL SALAZAR, individually and on behalf of all others similarly situated,

Plaintiff,

-against-

NATIONAL BASKETBALL ASSOCIATION,

Defendant.

---

Case No. 1:22-cv-07935 (JLR)

**OPINION AND ORDER**

JENNIFER L. ROCHON, United States District Judge:

Plaintiff Michael Salazar ("Plaintiff") brings claims on behalf of a putative class against Defendant National Basketball Association ("Defendant" or the "NBA"), the owner of NBA.com, under the under the Video Privacy Protection Act (VPPA), 18 U.S.C. § 2710.  Dkt. 72 ("SAC").  The NBA moves to dismiss the Second Amended Complaint pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6).  Dkt. 74.  For the reasons that follow, the Court GRANTS the motion to dismiss.

## BACKGROUND[1]

### I.    Factual Allegations

The NBA is an American sports league that owns the website NBA.com.  SAC ¶¶ 1, 17.  NBA.com provides "a broad selection of video content" in the "Videos" section of the site.  SAC ¶ 17(e).  Through NBA.com and the NBA mobile application (the "NBA App"), the NBA delivers "countless hours of video content to its digital subscribers."  SAC ¶ 17(g).

---

[1] Unless otherwise noted, the following facts are drawn from the Second Amended Complaint, which the Court "constru[es] . . . liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Herrera v. Comme des Garcons, Ltd.*, 84 F.4th 110, 113 (2d Cir. 2023) (quoting *Miller v. Metro Life Ins. Co.*, 979 F.3d 118, 121 (2d Cir. 2020)).

1

To register for NBA.com, users sign up for an online newsletter using their email address. SAC ¶ 39. According to Plaintiff, all digital subscribers provide the NBA with their IP address, a "unique number assigned to all information technology connected devices," that informs the NBA of a subscriber's "city, zip code, and physical location." SAC ¶ 41. Digital subscribers "have access to a variety of NBA.com Video Media" on NBA.com. SAC ¶ 44.

Nonparty Meta "promotes its ability to allow businesses to target their ads to specific audiences," SAC ¶ 98, including through the Meta Pixel tracking tool (the "Pixel"), "a snippet of JavaScript code" that lets online businesses "track visitor activity on [their] website[s]," SAC ¶ 100 (citation omitted). Once activated, the Pixel "tracks the people and [the] type[s] of actions they take," including the pages users visit and the "buttons they click." SAC ¶ 101 (citation omitted). Websites can also program the Pixel to track "conversions," actions that visitors to a website take, which can "be used to analyze the effectiveness of ad campaigns and to define custom audiences to adjust and create new campaigns." SAC ¶ 103.

Plaintiff alleges that the NBA installed the Pixel on NBA.com and that it uses the Pixel to collect users' data, including the videos viewed and their Facebook ID ("FID"), a "unique and persistent identifier that Facebook assigns to each user," which it then shares with Meta, the owner of Facebook and Instagram. SAC ¶¶ 7, 130; SAC at 1. Specifically, Plaintiff alleges that when a digital subscriber watches video media on NBA.com, the Pixel sends Meta "the video content name, the URL of the pre-recorded video that was viewed . . . , [and] the viewer['s] [FID]," SAC ¶ 120, through a "c_user_" cookie, SAC ¶ 131. *See, e.g.*, SAC ¶ 155 (example of HTTP communication sent from the NBA to Meta when a user watches a video).

SPA-3

Plaintiff became a digital subscriber to NBA.com in 2022. SAC ¶ 16. He has had a Facebook account since approximately 2010. SAC ¶ 16. Plaintiff did not discover that the NBA had disclosed his alleged personal viewing information to Meta until August 2022. SAC ¶ 176.

## II.    Procedural History

Plaintiff filed this suit on September 16, 2022. Dkt. 1. On December 2, 2022, the NBA moved to dismiss under Rules 12(b)(1) and 12(b)(6). Dkt. 20. The Court denied the motion to dismiss under Rule 12(b)(1) but granted the motion to dismiss under Rule 12(b)(6) because Plaintiff failed to plead that he was a consumer of goods and services from a video tape service provider within the meaning of the VPPA. *See Salazar v. Nat'l Basketball Ass'n* (*Salazar I*), 685 F. Supp. 3d 232, 246 (S.D.N.Y. 2023), *vacated and remanded*, 118 F.4th 533 (2d Cir. 2024). An appeal followed, Dkt. 53, and on October 15, 2024, the Second Circuit vacated the Court's judgment and remanded for further proceedings, holding that Plaintiff had plausibly pleaded that he was a consumer under the VPPA by alleging that he had subscribed to the NBA's digital newsletter. *See Salazar v. Nat'l Basketball Ass'n* (*Salazar II*), 118 F.4th at 546-53.

Plaintiff filed a First Amended Complaint on December 13, 2014. Dkt. 61. The NBA moved to dismiss the First Amended Complaint on January 13, 2025. Dkt. 62. After the motion was fully briefed, but before the Court had rendered a decision, Plaintiff moved to file a Second Amended Complaint on May 23, 2025, Dkt. 68, and the parties subsequently agreed to a stipulated schedule for Plaintiff to file a Second Amended Complaint and for a briefing schedule for any motion to dismiss, Dkt. 71.

Plaintiff filed the Second Amended Complaint (the "SAC") on June 12, 2025. *See generally* SAC. The NBA moved to dismiss on July 24, 2025. Dkt. 74; Dkt. 75 ("Br."). Plaintiff filed his

opposition on September 4, 2025, Dkt. 79 ("Opp."), and the NBA filed its reply on September 25, 2025, Dkt. 80 ("Reply").  The motion is thus fully briefed.[2]

## LEGAL STANDARD

Under Rule 12(b)(6), a complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Francis v. Kings Park Manor, Inc.*, 992 F.3d 67, 72 (2d Cir. 2021) (en banc) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  The court draws all reasonable inferences in the plaintiff's favor and accepts as true all nonconclusory allegations of fact.  *Id.*  However, a complaint must allege "more than a sheer possibility that a defendant has acted unlawfully" and more than "facts that are 'merely consistent with' a defendant's liability." *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 557 (2007)).  Determining whether a complaint states a plausible claim is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

## DISCUSSION

Plaintiff alleges that the NBA violated the VPPA when it disclosed his personally identifiable information to Meta through the Pixel.  SAC ¶¶ 186-197.  The NBA moves to dismiss the SAC, arguing that Plaintiff has failed to state a claim under the VPPA.  Dkt. 74.

The VPPA provides that "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider shall be liable to the aggrieved person."  18 U.S.C. § 2710(b)(1).  "To state a claim under the VPPA, a

---

[2] Plaintiff requested oral argument via notation on his motion.  The Court declines this request because the parties' briefing was sufficient and oral argument would not materially assist the Court. *See Dotson v. Griesa*, 398 F.3d 156, 159 (2d Cir. 2005) ("[A] district court acts well within its discretion in deciding dispositive motions on the parties' written submissions without oral argument.").

plaintiff must plausibly allege that (1) a video tape service provider (2) knowingly disclosed to any person (3) personally identifiable information concerning her use of the service." *Solomon v. Flipps Media, Inc.*, 136 F.4th 41, 44 (2d Cir. 2025).

The NBA argues that Plaintiff's claims should be dismissed because (1) under binding Second Circuit precedent, there was no disclosure of personally identifiable information under the VPPA, Br. at 11-15; and (2) Plaintiff does not allege knowing disclosure, *id.* at 15-18. The NBA also argues that even if the Court declines to dismiss the SAC in its entirety, it should dismiss the SAC's claims on behalf of a putative class, since Plaintiff waived them by accepting NBA.com's terms of use. *Id.* at 19-23. The Court need only address the NBA's first argument, that Plaintiff's claim is foreclosed by binding Second Circuit precedent because he has not alleged the disclosure of personally identifiable information under the VPPA.

The VPPA defines "personally identifiable information" as "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3). The Courts of Appeals have diverged in their interpretation of this term. *See Nixon v. Pond5, Inc.*, No. 24-cv-05823 (JLR), 2025 WL 2030303, at *4 (S.D.N.Y. July 21, 2025) (summarizing "reasonable foreseeability" standard used in the First Circuit and "ordinary person" standard used in the Third and Ninth Circuits). The Second Circuit recently adopted the "ordinary person" standard and held that "'personally identifiable information' encompasses information that would allow an ordinary person to identify a consumer's video-watching habits, but not information that only a sophisticated technology company could use to do so." *Solomon*, 136 F.4th at 52. Thus, to survive a motion to dismiss, plaintiffs must "plausibly allege[] that [the defendant]'s disclosure of [information] 'would, with little or no extra effort, permit an ordinary recipient to identify [the plaintiff]'s video-watching habits.'" *Id.* at 54 (quoting

5

*In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 284 (3d Cir. 2016)); *see Nixon*, 2025 WL 2030303, at *5 (applying standard articulated in *Solomon*).

The Second Circuit has now twice rejected Pixel-based VPPA claims like those brought here. In *Solomon*, the plaintiff brought a VPPA claim against a defendant that had installed the Pixel on its website. *See Solomon*, 136 F.4th at 54. Among other things, the Second Circuit found that the complaint did not "plausibly allege that an ordinary person could identify [the plaintiff] through her FID," since an ordinary person would not see the "c_user" cookie and the corresponding string of letters "and conclude that the phrase was a person's FID." *Id.*; *see also In re Nickelodeon*, 827 F.3d at 283 ("To an average person, an IP address or a digital code in a cookie file would likely be of little help in trying to identify an actual person."). Shortly thereafter, in *Hughes v. National Football League*, No. 24-2656, 2025 WL 1720295 (2d Cir. June 20, 2025) (summary order), the Second Circuit affirmed the dismissal of another VPPA action on this basis. *Id.* at *2. The Second Circuit declared that "*Solomon* effectively shut the door for Pixel-based VPPA claims." *Id.*; *see id.* at *3 (rejecting the argument that "a viewer's FID can be identified based on the string of numerals following the 'c_user' field" since it was "not plausible that an ordinary person, without [] annotation . . . , would see the 'c_user' phrase on [this communication] and conclude that the phrase was a person's FID" (alterations and omission in original) (quoting *Solomon*, 136 F.4th at 54)).

Faced with this landscape, Plaintiff principally argues that the Court should decline to apply *Solomon* and *Hughes* because those decisions purportedly contravened the Supreme Court's recent warnings against judge-made tests unsupported by statutory text and are inconsistent with *Salazar II*. *See* Opp. at 4-11. But this Court — like all district courts within the Second Circuit — is bound by *stare decisis* "to follow decisions of the Second Circuit until that court says otherwise."

6

*Rappaport v. Guardian Life Ins. Co. of Am.*, No. 22-cv-08100 (JLR), 2024 WL 4872736, at \*12 (S.D.N.Y. Nov. 22, 2024); *see United States v. Diaz*, 122 F. Supp. 3d 165, 179 (S.D.N.Y. 2015) (explaining that where "the Second Circuit has spoken directly to the issue presented by this case . . . this Court is required to follow that decision unless and until it is overruled in a precedential opinion by the Second Circuit itself or unless a subsequent decision of the Supreme Court so undermines it that it will almost inevitably be overruled by the Second Circuit." (citation and internal quotation marks omitted)), *aff'd*, 854 F.3d 197 (2d Cir. 2017).  Plaintiff has not cited any decision of the Second Circuit indicating that it is "all but certain to overrule" *Solomon*.  *Diaz*, 122 F. Supp. 3d at 179 (citation omitted).  Nor does the Court find *Solomon* inconsistent with *Salazar II*, as Plaintiff argues, Opp. at 7, given that the *Salazar II* court expressly acknowledged the distinction between the VPPA's broad definition of "consumer" and narrower definition of "personally identifiable information," *Salazar II*, 118 F.4th at 548, but deferred the question of "what exactly is 'personally identifiable information'" for a later day, *id.* at 549 n.10 (noting "we need not and do not explore" on this appeal "what exactly is 'personally identifiable information'"). *See also id.* at 548 ("[I]t's the definition of 'personally identifiable information' that limits what can be shared, not the definition of 'consumer.'"); *id.* at 549 (noting that while "consumer" should be understood broadly, "[t]his is not to say that the VPPA's reach is boundless," given that "the statute only prohibits video tape service providers from 'knowingly disclos[ing] *personally identifiable information*'" (alteration in original) (quoting 18 U.S.C. § 2710(b)(1))).  That later day came in *Solomon*.

In addition, the recent Supreme Court decisions to which Plaintiff cites do not persuade the Court that *Solomon* has been "so undermine[d] . . . that it will almost inevitably be overruled by the Second Circuit." *Diaz*, 122 F. Supp. 3d at 179.  *Ames v. Ohio Department of Youth Services*, 145 S.

Ct. 1540 (2025), *CC/Devas (Mauritius) Ltd. v. Antrix Corp.*, 145 S. Ct. 1572 (2025), and *A.J.T. ex rel. A.T. v. Osseo Area Schools*, 145 S. Ct. 1647 (2025), each dealt with unrelated and distinct statutes — Title VII, the Foreign Sovereignty Immunities Act, and the Americans with Disabilities Act of 1990 — and do not call into question the Second Circuit's interpretation of the term "personally identifiable information" in the VPPA. *See In re Guo*, 965 F.3d 96, 106 (2d Cir. 2020) (explaining that Supreme Court's "emphasis on the primacy of plain textual meaning" in decision involving statutory interpretation was "based on general principles of statutory construction that cast no doubt on [the Second Circuit's] precedent"). Moreover, in each case, the Supreme Court rejected the lower courts' tests because they were inconsistent with the text of the statute. *See Ames*, 145 S. Ct. at 1546 (rejecting "background circumstances" rule because it could not "be squared with the text of Title VII"); *Antrix*, 145 S. Ct. at 1576, 1580 (holding that Foreign Sovereign Immunity Act's personal jurisdiction provision did not import the "minimum contacts" analysis because there was no reference to "minimum contacts"); *A.J.T.*, 145 S. Ct. at 1655-56 (rejecting "bad faith or gross misjudgment rule" as inconsistent with broad statutory language making remedies available to "any person"). There is no basis for this Court to find that the Second Circuit's decision in *Solomon* runs afoul of the statutory text of the VPPA, and thus Plaintiff's reliance on these cases does not convince the Court that *Solomon* is soon to be overruled. Indeed, Plaintiff's same counsel made the identical arguments in their petition for panel rehearing or rehearing *en banc* to the Second Circuit in *Hughes*, and the request was denied. *See* Petition for Panel Rehearing or Rehearing En Banc at 10-12, *Hughes*, 2025 WL 1720295 (No. 24-2656), Dkt. No. 53 (citing *Ames*, *Antrix*, and *A.J.T.*); Order, *Hughes*, 2025 WL 1720295 (No. 24-2656), Dkt.

No. 54 (denying petition for panel rehearing and the request for rehearing *en banc*).[3]  As such, the

Court rejects Plaintiff's invitation to disregard *Solomon* and *Hughes* and applies the Second

Circuit's ordinary-person standard to evaluate Plaintiff's complaint.

Plaintiff's allegations mirror those found insufficient in *Solomon* and *Hughes*, as well as in

post-*Solomon* decisions considering Pixel-based VPPA claims.  Recently, in *Nixon v. Pond5, Inc.*,

this Court dismissed a VPPA claim based on allegations that "the Meta Pixel automatically caused

the [p]laintiffs' . . . personal identifiers, including the c_user . . . cookie[], to be transmitted to Meta,

attached to the fact that the [p]laintiffs . . . had viewed the website and the titles of the videos the

[p]laintiffs . . . viewed."  2025 WL 2030303, at *5 (omissions in original) (citation omitted).  The

Court rejected the plaintiffs' argument that the FIDs could "be identified from the c_user cookie

and [could] thus be used to identify their individual video-watching habits," since the Second

Circuit had twice rejected the theory and held that an ordinary person "would not plausibly be able

to identify [p]laintiff's video-watching habits as a result of the Pixel transmissions."  *Id.*  And just

last month, two other courts in this district rejected similar claims, relying on *Solomon* and *Hughes*.

*See Golden v. NBCUniversal Media, LLC*, No. 22-cv-09858 (PAE), 2025 WL 2530689, at *6-7

(S.D.N.Y. Sept. 3, 2025) (dismissing Pixel-based VPPA claims because allegations that "a person

---

[3] Similarly unhelpful are Plaintiff's citations to out-of-Circuit cases that engage in statutory interpretation of statutes other than the VPPA, almost all of which, like *Ames*, involved the interpretation of civil rights statutes.  *See McDaniel v. Preserve Prop. Mgmt. Co., LLC*, --- F. Supp. 3d ---, 2025 WL 2052642, at *2 (D.R.I. July 22, 2025) (interpreting state-law equivalent to Title VII); *United States v. Abdullahi*, 144 F.4th 1034, 1044-45 (8th Cir. 2025) (Stras, J., concurring in part) (interpreting federal kidnapping statute); *Moore v. United States*, 177 Fed. Cl. 89, 104 (2025) (Equal Pay Act); *Frutoz v. Valley Children's Hosp.*, No. 25-cv-00016, 2025 WL 1767953, at *5-6 (E.D. Cal. June 26, 2025) (EMTALA); *Charlton-Perkins v. Univ. of Cincinnati*, No. 20-cv-00179, 2025 WL 2390365, at *11 n.9 (S.D. Ohio Aug. 18, 2025) (Title IX and Equal Protection Clause).  *Simon v. Ivey*, No. 25-cv-00067, 2025 WL 2345845 (N.D. Ala. Aug. 13, 2025), merely applied *Ames*'s holding that "there is not a heightened standard for showing discrimination against a member of a majority group" in a First Amendment case, *id.* at *60, and has no relevance to the Court's interpretation of the VPPA.

SPA-10

with the right tools can use an FID to identify a specific Facebook user" did not satisfy the ordinary-person standard based on *Solomon*, *Hughes*, and *Nixon*); *Taino v. Bow Tie Cinemas, LLC*, No. 23-cv-05371 (VSB), 2025 WL 2652730, at *7-8 (S.D.N.Y. Sept. 16, 2025) (dismissing Pixel-based VPPA claims based on allegations that were "essentially identical . . . to the allegations made by the plaintiff in *Solomon*"). Like the complaints in *Solomon*, *Hughes*, *Nixon*, *Golden*, and *Taino*, the SAC here alleges that the NBA "disclosed users' video-viewing activity to [Meta] via the Pixel, specifically by transmitting URLs, FIDs, and video-watching history without [Plaintiff's] knowledge or consent." *Golden*, 2025 WL 2530689, at *7; *see* SAC ¶¶ 155-156. It includes an example of an alleged transmission to Facebook with lines of computer code. SAC ¶ 155. And it alleges that since a person with the right know-how can use an FID to identify a specific Facebook user, the data is personally identifiable information for purposes of the VPPA. *Id.* ¶¶ 156-158. Plaintiff insists that the information is personally identifiable information because a person can use a simple online search to identify a specific Facebook user using an FID or use ChatGPT to do so. *Id.* ¶¶ 132-133, 144. Yet the Second Circuit rejected near-identical arguments in *Hughes* on the ground that such allegations did not make it plausible that "an ordinary person would be able to understand the actual underlying code communication itself," *Hughes*, 2025 WL 1720295, at *3 (rejecting that potential use of "ubiquitous internet-based tools like ChatGPT" to translate the code was sufficient), and courts considering similar contentions since have likewise found them unpersuasive, *see, e.g.*, *Taino*, 2025 WL 2652730, at *8 (claim that "someone could perform 'a Google search using the word "Facebook" plus a given Facebook ID number' to identify the user's Facebook profile, [was] likewise insufficient to demonstrate that an ordinary person would know what to do with the c_user information to pinpoint an individual's identity" (citation omitted)); *Golden*, 2025 WL 2530689, at *7 ("[D]isclosures comprehensible only to Facebook or other

SPA-11

sophisticated actors are not [personally identifiable information].").  There is no basis for the Court to reach a different result here.  Because an ordinary person would not plausibly be able to identify Plaintiff's video-watching habits as a result of the Pixel transmissions, Plaintiff has not plausibly alleged that the NBA disclosed personally identifiable information in violation of the VPPA.

## CONCLUSION

For the foregoing reasons, the Court GRANTS the NBA's motion to dismiss.  The Second Amended Complaint is dismissed with prejudice.  The Clerk of Court is respectfully directed to terminate the motion at Dkt. 74 and close the case.

Dated: October 6, 2025
       New York, New York

SO ORDERED.

_Jennifer Rochon_

JENNIFER L. ROCHON
United States District Judge

11

SPA-12

LII > U.S. Code > Title 18 > PART I > CHAPTER 121 **> § 2710**

Quick search by citation:

**Title**

enter title

**Section**

section

Go!

# 18 U.S. Code § 2710 - Wrongful disclosure of video tape rental or sale records

U.S. Code    Notes

**(a)** DEFINITIONS.—For purposes of this section—

**(1)** the term "consumer" means any renter, purchaser, or subscriber of goods or services from a video tape service provider;

**(2)** the term "ordinary course of business" means only debt collection activities, order fulfillment, request processing, and the transfer of ownership;

SPA-13

**(3)** the term "personally identifiable information" includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider; and

**(4)** the term "video tape service provider" means any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials, or any person or other entity to whom a disclosure is made under subparagraph (D) or (E) of subsection (b)(2), but only with respect to the information contained in the disclosure.

**(b)** VIDEO TAPE RENTAL AND SALE RECORDS.—

**(1)** A video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider shall be liable to the aggrieved person for the relief provided in subsection (d).

**(2)** A video tape service provider may disclose personally identifiable information concerning any consumer—

**(A)** to the consumer;

**(B)** to any person with the informed, written consent (including through an electronic means using the Internet) of the consumer that—

**(i)** is in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer;

**(ii)** at the election of the consumer—

**(I)** is given at the time the disclosure is sought; or

**(II)** is given in advance for a set period of time, not to exceed 2 years or until consent is withdrawn by the consumer, whichever is sooner; and

**(iii)** the video tape service provider has provided an opportunity, in a clear and conspicuous manner, for the consumer to withdraw on a case-by-case basis or to withdraw from ongoing disclosures, at the consumer's election;

**(C)** to a law enforcement agency pursuant to a warrant issued under the Federal Rules of Criminal Procedure, an equivalent State warrant, a grand jury subpoena, or a court order;

**(D)** to any person if the disclosure is solely of the names and addresses of consumers and if—

   **(i)** the video tape service provider has provided the consumer with the opportunity, in a clear and conspicuous manner, to prohibit such disclosure; and

   **(ii)** the disclosure does not identify the title, description, or subject matter of any video tapes or other audio visual material; however, the subject matter of such materials may be disclosed if the disclosure is for the exclusive use of marketing goods and services directly to the consumer;

**(E)** to any person if the disclosure is incident to the ordinary course of business of the video tape service provider; or

**(F)** pursuant to a court order, in a civil proceeding upon a showing of compelling need for the information that cannot be accommodated by any other means, if—

   **(i)** the consumer is given reasonable notice, by the person seeking the disclosure, of the court proceeding relevant to the issuance of the court order; and

   **(ii)** the consumer is afforded the opportunity to appear and contest the claim of the person seeking the disclosure.

   If an order is granted pursuant to subparagraph (C) or (F), the court shall impose appropriate safeguards against unauthorized disclosure.

**(3)** Court orders authorizing disclosure under subparagraph (C) shall issue only with prior notice to the consumer and only if the law enforcement agency shows that there is probable cause to believe that the records or other information sought are relevant to a legitimate law enforcement inquiry. In the case of a State government authority, such a court order shall not issue if prohibited by the law of such State. A court issuing an order pursuant to this section, on a motion made promptly by the video tape service provider, may quash or modify such order if the information or records requested are unreasonably voluminous in nature or if compliance with such order otherwise would cause an unreasonable burden on such provider.

**(c)** Civil Action.—

SPA-15

**(1)** Any person aggrieved by any act of a person in violation of this section may bring a civil action in a United States district court.

**(2)** The court may award—

    **(A)** actual damages but not less than liquidated damages in an amount of $2,500;

    **(B)** punitive damages;

    **(C)** reasonable attorneys' fees and other litigation costs reasonably incurred; and

    **(D)** such other preliminary and equitable relief as the court determines to be appropriate.

**(3)** No action may be brought under this subsection unless such action is begun within 2 years from the date of the act complained of or the date of discovery.

**(4)** No liability shall result from lawful disclosure permitted by this section.

**(d) PERSONALLY IDENTIFIABLE INFORMATION.—**
Personally identifiable information obtained in any manner other than as provided in this section shall not be received in evidence in any trial, hearing, arbitration, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the United States, a State, or a political subdivision of a State.

**(e) DESTRUCTION OF OLD RECORDS.—**
A person subject to this section shall destroy personally identifiable information as soon as practicable, but no later than one year from the date the information is no longer necessary for the purpose for which it was collected and there are no pending requests or orders for access to such information under subsection (b)(2) or (c)(2) or pursuant to a court order.

**(f) PREEMPTION.—**
The provisions of this section preempt only the provisions of State or local law that require disclosure prohibited by this section.

(Added Pub. L. 100–618, § 2(a)(2), Nov. 5, 1988, 102 Stat. 3195; amended Pub. L. 112–258, § 2, Jan. 10, 2013, 126 Stat. 2414.)